**BANK BRUSSELS LAMBERT,**
Plaintiff–Appellant,

v.

**FIDDLER GONZALEZ & RODRI-
GUEZ, Defendant–Appellee.**

Docket No. 98–7706

United States Court of Appeals,
Second Circuit.

Argued Jan. 12, 1999.

Decided March 26, 1999.

LANCE GOTTHOFFER, Oppenheimer Wolff & Donnelly, New York, N.Y. (Peter A. Stroili, of counsel), for Plaintiff–Appellant.

ROBERT E. KUSHNER, D'Amato & Lynch, New York, N.Y. (Thomas M. Gandolfo, Ann G. Kayman, of counsel), for Defendant–Appellee.

* The Honorable Leonard B. Sand, District Judge of the United States District Court for the Southern District of New York, sitting by designation.

Before: JACOBS and SOTOMAYOR, Circuit Judges, and SAND,* District Judge.

SOTOMAYOR, Circuit Judge:

Plaintiff-appellant Bank Brussels Lambert appeals from an order of the United States District Court for the Southern District of New York (McKenna, *J.*) granting defendant's Rule 12(b)(2) motion to dismiss the complaint for lack of personal jurisdiction. Plaintiff brought suit for fraud, breach of fiduciary duty and breach of the implied contractual duties of candor and full disclosure, all in connection with legal services performed on its behalf by defendant-appellee law firm Fiddler Gonzalez & Rodriguez. The district court held that personal jurisdiction over the defendant was unwarranted under New York's long-arm statute, C.P.L.R. § 302(a) subsections (1), (2) and (3), and under the common law co-conspirator and aider and abettor doctrines. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, No. 96 Civ. 7233(LMM), 1998 WL 182434 (S.D.N.Y. Apr. 17, 1998). We agree with all of the court's jurisdictional rulings but one. The district court erred by finding that the "injury" alleged in this case occurred outside of New York, and that jurisdiction under § 302(a)(3) was inappropriate on that ground. From the record on appeal, it is, however, unclear whether plaintiff has even averred sufficient facts to establish a tort, as is required for jurisdiction under § 302(a)(3). We therefore remand to the district court to determine whether plaintiff has sufficiently alleged an actionable tort and whether plaintiff has met the other requirements for jurisdiction under subparts (i) or (ii) of § 302(a)(3).

## BACKGROUND

Bank Brussels Lambert ("BBL") is a banking corporation organized and existing under the laws of Belgium, with its principal place of business in Brussels,

Belgium. BBL has a New York branch registered with the United States Comptroller of Currency, and BBL conducted all of the relevant activities in this case through its New York branch.

Fiddler Gonzalez & Rodriguez ("Fiddler") is a law firm with its principal place of business in San Juan, Puerto Rico. Many New York corporations, as well as corporations from around the world, retain Fiddler to address issues of Puerto Rican law, and Fiddler appears to derive a substantial percentage of its income from these out-of-state clients. Often, these clients seek Fiddler's services because of referrals from other clients. The parties dispute whether Fiddler also solicits some business from New York clients through telefaxes. Although most of Fiddler's assets are located in Puerto Rico, and although Fiddler performs most of its services on the island, Fiddler owns an apartment in Manhattan, which it claims as a business expense on its tax forms, and which at least two partners have used for business trips that were subsequent and unrelated to the transactions in this case.

In November 1989, BBL joined a five-member lending group (collectively, the "banks") that was negotiating a secured $245,000,000 revolving credit agreement ("RCA") with two affiliated oil companies, known collectively as "Arochem." Arochem has its principal place of business in Stamford, Connecticut. The lending group was headed by The Chase Manhattan Bank, N.A. ("Chase New York"), and all five lenders were either New York domiciliaries or sought to participate in the loan through their New York branches. As principal collateral for the loan, Arochem offered a security interest in one of its main oil refineries, which was located in Puerto Rico, as well as certain of its inventories.

Before accepting the collateral and closing on the loan, the banks required an opinion from a Puerto Rican law firm concerning the validity and enforceability of the security interests they were acquiring. Chase New York recommended Fiddler for the job, largely because Fiddler had performed well over the course of a long-standing attorney-client relationship with the Chase Manhattan branch in Puerto Rico ("Chase Puerto Rico"). Fiddler was subsequently contacted to help execute the relevant security documents and to provide the needed opinion. In the process, the banks sent Fiddler a draft RCA, which described the contemplated loan transaction and stated that Fiddler's opinion would be a condition precedent to the loan disbursements as follows:

*Initial Loan.* The obligation of any Bank to make its initial Loan or the issuance of the initial Letter of Credit hereunder is subject to the receipt by the Agent of the following documents, each of which shall be satisfactory to the Agent in form and substance:

. . . . .

*Opinion of Special Puerto Rico Counsel to the Lender.* An opinion of Fiddler, Gonzalez & Rodriguez, special Puerto Rico counsel to the Banks, substantially in the Form of Exhibit G hereto.

Draft RCA dated Dec. 19, 1989, at ¶ 6.01(e). Exhibit G, which was also sent to Fiddler, was a model opinion concerning a security interest in Arochem's Puerto Rican oil refinery. The draft RCA specified that the agreement would be governed by New York law and contained a New York choice of forum provision. Shortly after receiving these materials, Fiddler agreed to act as the bank's special Puerto Rican counsel and perform the tasks indicated.

Fiddler performed all of its relevant legal research and writing in Puerto Rico and attended the closing of the relevant security documents on the island. Neither Fiddler's partners nor its agents entered New York in connection with any of these services. On occasion, however, Fiddler contacted one or more of the banks or

their counsel in New York to discuss the opinion drafting process or the security documents. Fiddler also responded to similar contacts from these parties. In December 1989, Fiddler completed its first draft opinion. The opinion acknowledged that Fiddler had agreed to act as special Puerto Rico counsel for the banks and that Fiddler was furnishing the opinion in connection with the RCA between Arochem and the banks. The draft opinion was, however, addressed only to Chase Puerto Rico in San Juan.

Each of the banks was represented by separate counsel, but the primary liaison between all of the banks and Fiddler was the New York law firm of Milbank, Tweed, Hadley & McCloy ("Milbank Tweed"). After receiving Fiddler's first draft opinion, both Milbank Tweed and BBL's separate New York counsel contacted Fiddler to request that the opinion be addressed to all the banks. Fiddler agreed to address the final opinion to:

> The Chase Manhattan bank, N.A. ("Chase") individually, and as Agent for the banks and other Lenders (the "Banks"), and to the Banks party to the Revolving Credit Agreement dated as of January 1, 1990 and to Chase as Intercreditor Agent for Chase, Drexel Burnham Lambert Trade Finance Inc. and the Banks under the Intercreditor Agreement dated as of January 1, 1990
> 1 Chase Manhattan Plaza
> New York, New York

Fiddler Opinion at 1. The RCA did not list the addresses of each bank individually, and it is unclear from the record whether Fiddler knew that all five participating banks were either New York banks or New York branches of banks located elsewhere. The final opinion did, however, explicitly reference the RCA transaction and state that "[t]his opinion is being rendered ... for your exclusive benefit in connection with the transactions described herein." *Id.*

The final RCA was dated January 1, 1990, and the loan closed in New York on January 17, 1990. The agreement—just like the draft sent to Fiddler—contained New York choice of law and forum provisions. Disbursement of the loan was also still conditioned on Chase New York's receipt of Fiddler's opinion. Although the parties dispute whether Fiddler sent its final opinion to Chase in New York or delivered it to one of Chase New York's agents at the closing of the security documents in Puerto Rico, the opinion was received by January 22, 1990, and Fiddler addressed it to Chase New York, as agreed. On January 22, 1990, BBL disbursed $75,000,000 to Arochem, as was required under the RCA. BBL made this disbursement from an account in New York.

Nearly two years later, on December 23, 1991, Arochem defaulted on the RCA loan. Shortly thereafter, Will Harris, the president and majority shareholder of Arochem, was convicted of multiple counts of bank fraud, *see United States v. Harris,* 79 F.3d 223 (2d Cir.1996), and in these proceedings, it became apparent that Arochem may have systematically misreported the value of its assets to the RCA lenders, *see id.* at 226. In February 1992, Arochem filed for bankruptcy, and BBL subsequently sued Chase New York for fraud and breach of contract in connection with its role in closing the RCA transaction.

In the course of discovery, Fiddler inadvertently produced several attorney-client memoranda that Chase Puerto Puerto Rico had provided to Pedro Polanco, a Fiddler partner, on January 17, 1990. Although the memoranda were furnished to Polanco on the same day as the RCA closing, they related to a separate representation of Chase Puerto Rico, as Polanco was not involved in any way with the Arochem RCA. According to BBL, these exchanged memoranda suggested that Harris had been manipulating the company's accounting procedures and financial reports in order to purchase Arochem stock from a second shareholder at an artificially

depressed price, thereby enhancing his position in an ongoing dispute with a third shareholder. Fiddler also produced several related documents that Fiddler allegedly helped Chase Puerto Rico prepare in order to sanitize the record of these activities.

In light of these newly discovered documents, BBL commenced the present action against Fiddler. BBL complained that Fiddler's opinion merely followed the model Exhibit G and omitted to mention the newly learned information from Chase Puerto Rico, even though the honesty of Arochem's management and the integrity of its financial reporting were relevant to BBL's decision to fund the Arochem loan. BBL argued that Fiddler's actions thus constituted fraud, breach of fiduciary duty and breach of the parties' contract for legal services.

Fiddler responded to BBL's complaint with a motion to dismiss asserting lack of personal jurisdiction, failure to bring the action within the relevant statutes of limitations and failure to plead fraud with sufficient particularity. The district court dismissed the action for lack of personal jurisdiction, holding that C.P.L.R. § 302 failed to provide a jurisdictional basis for this action against Fiddler. The court also held that BBL failed to allege sufficient facts to establish personal jurisdiction under the common law aider and abettor or co-conspirator doctrines. This appeal followed.

## DISCUSSION

### A. *Standards of Review and the Existence of a Tort*

 The issue on appeal is whether there are grounds to exercise personal jurisdiction over Fiddler in this case. As a general rule, "the amenability of a foreign corporation to suit in a federal court in a diversity action is determined in accordance with the law of the state where the court sits, with 'federal law' entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee." *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 223 (2d Cir.1963) (en banc); *see also Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996). District courts resolving issues of personal jurisdiction must therefore engage in a two-part analysis. First, they must determine whether there is jurisdiction over the defendant under the relevant forum state's laws—which, in this case, are the various subsections of New York's C.P.L.R. § 302(a) and the common law co-conspirator and aider and abettor doctrines. Second, they must determine whether an exercise of jurisdiction under these laws is consistent with federal due process requirements. *See Met. Life*, 84 F.3d at 567. We review a district court's dismissal of an action for want of personal decision *de novo. Id.*

 When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant. *See Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir.1994). Where a "court [has chosen] not to conduct a full-blown evidentiary hearing on the motion, the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials." *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir.1981). Where as here, however, "the parties have conducted extensive discovery regarding the defendant's contacts with the forum state, but no evidentiary hearing has been held—'the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant.'" *Met. Life*, 84 F.3d at 567 (quoting *Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). In this case, both C.P.L.R. § 302(a)(2) and § 302(a)(3) require either a

tort inside of New York[1] or a tort outside of New York that causes injury within the state[2] in order to establish jurisdiction. BBL also argues for jurisdiction under § 302(a)(1) in part by alleging that Fiddler engaged in tortious activity that arose out of a transaction of business in New York or a contract to perform services in the state. In order to succeed under any of these theories under *Met Life*, BBL must therefore aver facts that if credited, would suffice to establish all the requirements under one of § 302(a)'s subsections, including the commission of a tort, the allegation fatally missing in *PI, Inc. v. Quality Products, Inc.*, 907 F.Supp. 752, 762 (S.D.N.Y. 1995) (refusing to exercise personal jurisdiction under § 302(a)(2)—which confers jurisdiction over persons who commit torts in New York—because plaintiff "failed to state a cause of action for fraud distinct from a claim for breach of contract").

With regard to its tort allegations for fraud and breach of fiduciary duty, BBL does not claim that Fiddler's opinion contained any affirmative misrepresentations. Rather, BBL argues that as result of either its attorney-client relationship with BBL or its contract to provide legal services to BBL, Fiddler had an affirmative duty to disclose information obtained during its separate attorney-client consultation with Chase Puerto Rico on January 17, 1990. Under the law of most states, this contention would be plainly wrong because Fiddler would have had an affirmative duty *not* to disclose any information obtained under the cloak of the attorney-client privilege. *See, e.g.*, Model Rules of Professional Conduct Rule 1.6 (1995) (imposing broad requirement of client confidentiality); N.Y.Code of Professional Responsibility EC 4–1 (McKinney's 1998) ("Both the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require the preservation by the lawyer of confidences and secrets of one who has employed or sought to employ the lawyer."); *see also In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1036 (2d Cir.1984). At most, Fiddler might have had a duty to withdraw upon discovery of the conflict. *See, e.g.*, Model Rules of Professional Conduct Rule 1.16(a)(1) (requiring withdrawal from representation when continued representation would require violation of rules governing the attorney-client relationship); N.Y.Code of Professional Responsibility EC 4–5, notes of decisions ¶ 2 ("An attorney representing joint clients must withdraw from the joint representation if information obtained 'in confidence' from one of the joint clients gives rise to a conflict of interest with the other joint client"). Moreover, Fiddler would have had this duty to withdraw under circumstances that did not reveal the contents of the privileged materials. *See, e.g.*, Model Rules of Professional Conduct, Rule 1.6 cmt. 16 ("After withdrawal the lawyer is required to refrain from making disclosure of the client's confidences, except as otherwise provided in Rule 1.6."); N.Y.Code of Professional Responsibility EC 4–5 (stating that in all cases, "[c]are should be exercised by a lawyer to prevent the disclosure of the confidences and secrets of one client to another"). It is thus far from clear that BBL has averred sufficient facts to establish an actionable tort in this case, as is required under several of its jurisdictional theories.

At this stage, we nevertheless decline to dismiss any of BBL's arguments on these grounds. Puerto Rico is a mixed civil and

---

1. C.P.L.R. § 302(a)(2) allows for "personal jurisdiction over any non-domiciliary ... who in person or through an agent ... commits *a tortious act within the state* ...." (Emphasis added).

2. C.P.L.R. § 302(a)(3) allows for personal jurisdiction over "any non-domiciliary ... who in person or through an agent ... commits a *tortious act without the state causing injury to person and property within the state*," so long as certain other requirements are also met, as outlined in subsections (i) and (ii). (Emphasis added.)

common law rather than a pure common law jurisdiction. *See, e.g., Ennio M. Colon Garcia et al., Puerto Rico: A Mixed Legal System: The Magistrates and the Courts,* 32 Rev. Jur. U.I.P.R. 257, 257 (1998) ("Puerto Rico has a distinct mixture of civil law tradition and common law influences that in essence come together to define what is known in laymen's terms as a 'mixed jurisdiction.'"). Puerto Rico is also a commonwealth rather than a state, and it has a unique status in our federal system. *See, e.g., Examining Board v. Flores de Otero,* 426 U.S. 572, 596, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976). Consequently, some of our most familiar common law tort concepts may be inapplicable there. *See Ennio M. Colon Garcia et al., Puerto Rico: A Mixed Legal System: Judicial Reception of Common Law,* 32 Rev. Jur. U.I.P.R. 285, 288–90 ("[T]he Law of Torts of Puerto Rico was of romanized civil law tradition upon arrival of the United States forces in 1898[and] ... the efforts of the Supreme Court of Puerto Rico [have generally been] to preserve the civil law tradition [against common law influences] in the construction of the articles concerned with torts."). Puerto Rico also has its own code of professional conduct. *Compare* Code of Professional Ethics of Puerto Rico, 4 L.P.R.A.App. IX *with, e.g.,* ABA Model Code of Professional Responsibility. All of these points, finally, invite the more basic question of whether New York or Puerto Rico law applies in determining whether a tort occurred in this case. Although these questions are absolutely crucial to many of the present jurisdictional analyses, we will not decide them here because neither the district court nor the parties has had an opportunity to address them and because it is unclear whether the parties have taken or need discovery on these issues. Any subsequent finding of personal jurisdiction premised on the existence of a tort will, however, have to address whether BBL has sufficiently averred a tort under the law of the pertinent jurisdiction.

## B. Long–Arm Jurisdiction Under the District Court's Rulings

As stated above, the district court dismissed this case on the ground that it lacked personal jurisdiction over Fiddler under N.Y.C.P.L.R. § 302(a)(1), (2) and (3) and under the common law co-conspirator and aider and abettor doctrines. Although most of these rulings will be mooted if BBL has failed to aver an actionable tort, BBL has properly challenged the district court's rulings before this Court, and both parties have briefed these issues in detail. In addition, BBL's argument for jurisdiction under § 302(a)(1) is premised on an allegation of contractual breach as well as tortious conduct. We address jurisdiction under all of the bases asserted by BBL, both in light of these facts and in order to prevent the issues from arising again after remand. *Cf. United States v. Jean–Baptiste,* 166 F.3d 102 (2d Cir.1999) ("Although these issues are, for purposes of this appeal, mooted by our decision above, we address them briefly in light of the likelihood that they would recur at a new trial.").

### (1) C.P.L.R. § 302(a)(1)—*Transaction of Business or Contract to Supply Goods/Services in New York*

BBL argues that the district court has personal jurisdiction over Fiddler under C.P.L.R. § 302(a)(1), which states that "a court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent ... [1] transacts any business within the state or [2] contracts anywhere to supply goods or services in the state...." This subsection thus has two prongs, either of which can form a basis for the exercise of personal jurisdiction over a non-domiciliary. *See, e.g., Holness v. Maritime Overseas Corp.,* 251 A.D.2d 220, 676 N.Y.S.2d 540, 544 (1st Dep't 1998); *Etra v. Matta,* 61 N.Y.2d 455, 458–59, 474 N.Y.S.2d 687, 463 N.E.2d 3 (1984). BBL argues for jurisdiction under both prongs.

### (i) Transaction of Business Within the State

■ It is well settled that in order for a court to obtain personal jurisdiction over a party under the "transaction of business" prong of § 302(a)(1), the party need not be physically present in the state at the time of service. *See Parke–Bernet Galleries v. Franklyn*, 26 N.Y.2d 13, 16, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970). Rather, § 302(a)(1) extends the jurisdiction of New York state courts to any nonresident who has 'purposely availed [himself] of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws . . . .' *Id.* at 18, 308 N.Y.S.2d 337, 256 N.E.2d 506. "[A] 'single transaction would be sufficient to fulfill this requirement,' " *id.* at 284, so long as the relevant cause of action also arises from that transaction.[3] *See George Reiner & Co. v. Schwartz*, 41 N.Y.2d 648, 651, 394 N.Y.S.2d 844, 363 N.E.2d 551 (1977).

■ To determine whether a party has "transacted business" in New York, courts must look at the totality of circumstances concerning the party's interactions with, and activities within, the state. *See, e.g., Peekskill Community Hosp. v. Graphic Media, Inc.*, 198 A.D.2d 337, 338, 604 N.Y.S.2d 120 (2d Dep't 1993); *Etra*, 61 N.Y.2d at 459, 474 N.Y.S.2d 687, 463 N.E.2d 3. The New York Court of Appeals has found a transaction of business when, for example, a foreign corporation used a New York distributor to ship substantial quantities of goods into the state, the sales of which were produced by means of solicitations and advertisements in the state. *See Singer v. Walker*, 15 N.Y.2d 443, 466–67, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965). The Court of Appeals has, however, also held that there was no transaction of business in New York when a respondent was domiciled out of state,

conducted his personal business activities out of state, had no office, bank account or telephone listings in New York, and neither solicited business in the state nor "entered th[e] State in connection with his dealings" with the New York plaintiff. *See Ferrante*, 26 N.Y.2d at 284, 309 N.Y.S.2d 913, 258 N.E.2d 202. The court explained that "in order to sustain jurisdiction, there must be some transaction attributable to the one sought to be held *which occurs in New York.*" *Id.* (emphasis added).

■ On the undisputed facts of this case, Fiddler is a law firm located and incorporated in Puerto Rico. It performed all of its legal research and writing services in preparing the Fiddler opinion and closing the relevant security documents in Puerto Rico, and none of its partners or agents either entered New York or were required to be physically present to perform any of these services. Although Fiddler may have solicited some business from New York corporations through telefaxes, BBL's Vice President conceded that "[t]he Fiddler firm was proposed by Chase [New York]," and was contacted to perform legal services on the basis of this recommendation. (LaBelle Decl. ¶ 6.) Consequently, the present action does not arise out of any alleged New York business solicitations, as would be required for § 302(a)(1) jurisdiction premised on solicitations. *See, e.g., Holness*, 676 N.Y.S.2d at 543; *George Reiner*, 41 N.Y.2d at 648, 394 N.Y.S.2d 844, 363 N.E.2d 551. Thus, under the totality of circumstances, none of BBL's causes of action appear to have arisen from a transaction of business in New York.

BBL argues, however, that "lawyers and other professionals today transact business with their pens, their fax machines and their conference calls—not with their feet. As such physical presence in New York is

---

**3.** The cause of action need not be for breach of contract, however. *See Singer v. Walker*, 15 N.Y.2d 443, 466, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965) ("It is clear that paragraph 1 is not limited to actions in contract; it applies as well to actions in tort when supported by a sufficient showing of facts [to establish that the tort arose out of the relevant transaction].").

not a condition precedent for application of C.P.L.R. § 302(a)(1)." (Pl.'s Br. at 29.) The best New York Court of Appeals case that BBL could have cited for this proposition—but did not—is *Parke–Bernet Galleries, Inc. v. Franklyn,* 26 N.Y.2d 13, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970). There, an auction took place in New York, and on the day before the auction, the defendant called the plaintiff and requested that " 'telephonic communication be established between [him] and [Parke–Bernet] during the course of the bidding,' so that he might keep abreast of and take part in the bidding while the auction was actually going on." *Id.* at 15, 308 N.Y.S.2d 337, 256 N.E.2d 506. The defendant later confirmed by telegram his desire to participate in the auction. The plaintiff agreed and created an open telephone line for the defendant, through which he ultimately bought two paintings at the auction. In a subsequent action for breach of contract, which arose out of a failure to pay for the paintings, the Court of Appeals held that the defendant's activities constituted business transactions that occurred within the state for § 302(a)(1) purposes. The court reasoned that "[i]t is important to emphasize that one need not be physically present in order to be subject to the jurisdiction of our courts under C.P.L.R. [§ ] 302 for, particularly in this day of instant long-range communications, one can engage in extensive purposeful activity here without actually setting foot in the State." *Id.* at 16, 308 N.Y.S.2d 337, 256 N.E.2d 506.

In *Etra v. Matta,* 61 N.Y.2d 455, 474 N.Y.S.2d 687, 463 N.E.2d 3 (1984), however, the Court of Appeals examined a quite different series of telephonic and written communications and held that they did not amount to a "transaction of business." *Etra* involved a decedent who was a resident of New York and who had a severe heart condition. The decedent sought treatment for his condition from a specialized physician in Massachusetts, who treated him in Massachusetts. "Because decedent's treatment program involved the continued use of Aprindine, available only

from a clinical investigator such as [the defendant], decedent was [also] provided with a supply of the drug to take back to New York." *Id.* at 457–58, 474 N.Y.S.2d 687, 463 N.E.2d 3. Thereafter, the defendant continued to act as a medical consultant by sending telephonic and written communications to the decedent's primary physicians, who continued treating him in New York. The defendant may also have sent additional Aprindine to the plaintiff in New York. The Court of Appeals nevertheless held that "[v]iewing the totality of [the defendant's] contacts with this State, in the form of written and telephonic communications and the additional provision of the experimental drug, we believe them to be too insubstantial to amount to such a 'transaction of business' as to warrant subjecting [the defendant] to suit in this forum." *Id.* at 458–59, 474 N.Y.S.2d 687, 463 N.E.2d 3.

Although Fiddler communicated with plaintiff in New York by phone, fax and possibly mail, the present case is ultimately much more like *Etra* than *Parke–Bernet.* All of Fiddler's communications involved either the negotiation of the original agreement for legal services, editorial comments during the process of preparing the final Fiddler opinion or interactions concerning the closing of the security documents in Puerto Rico. In none of these communications did Fiddler, like the defendant in *Parke–Bernet,* project itself into New York to participate in any activities localized in the state or to represent the banks during any New York transactions. Although the RCA transaction occurred in New York, there is no allegation, for example, that Fiddler represented the banks during the RCA closing; and the only closing that Fiddler attended was for the security documents, which occurred in Puerto Rico. *Etra* rather than *Parke–Bernet* is the relevant precedent on the facts of this case. *See also Mayes v. Leipziger,* 674 F.2d 178, 185 (2d Cir.1982) (holding that whatever the reach of § 302(a)(1) may be, "no court

has extended § 302(a)(1) to reach a non-domiciliary who never entered New York, who was solicited outside of New York, who performed outside of New York such services as were performed, and who is alleged to have neglected to perform other services outside of New York").

### (ii) Contract Anywhere to Supply Goods or Services in the State

BBL also argues that the district court had jurisdiction over Fiddler under the second prong to § 302(a)(1), which extends jurisdiction to defendants who "contract anywhere to supply goods or services in the state." The New York Legislature added this second prong to the provision in 1979 in order to "ease the plight of New York residents seeking to obtain jurisdiction over those outside its borders who may be deemed virtually or constructively to do business in this state." *Waldorf Associates, Inc. v. Neville*, 141 Misc.2d 150, 533 N.Y.S.2d 182, 185 (Sup.Ct.1988). This provision captures cases where there are minimal contacts in New York, and, for example, a contract is made elsewhere for goods to be delivered or services to be performed in New York. *See* Report of the Law Revision Commission for 1979, Leg. Doc. No. 65, 1979 N.Y. Laws A–31, A–59 (McKinney's). Thus, even if a defendant never enters the state to negotiate one of these contracts, to complete performance or for any other reason, the second prong of § 302(a)(1) can provide long-arm jurisdiction over a defendant who has minimal contacts with the state and who has entered a contract anywhere to supply goods or services in the state. *See, e.g., Island Wholesale Wood Supplies, Inc. v. Blanchard Indus., Inc.*, 101 A.D.2d 878, 879–80, 476 N.Y.S.2d 192 (2d Dep't 1984).

In support of its argument for § 302(a)(1) jurisdiction, BBL cites *Schur v. Porter*, 712 F.Supp. 1140 (S.D.N.Y.1989), and reads it as standing for the proposition that § 302(a)(1) grants personal jurisdiction over out-of-state law firms whenever they provide services in connection with transactions located in New York. In *Schur*, an out-of-state attorney was retained to break up a joint interest in two New York corporations, which had been held by three New York residents, and to form a partnership between them for the ownership and control of the residual New York properties. The attorney drafted the relevant agreements in Maryland and only once entered New York in connection with these activities. Much as in *Parke–Bernet*, however, the attorney also projected himself into New York by representing the plaintiffs by telephone during the closing of the agreements, which took place in New York, was between New York residents and was governed by New York law. The court held that under these circumstances, the attorney "agreed to and did supply services in New York for a New York business transaction." *Id.* at 1145. Jurisdiction over him was therefore appropriate under § 302(a)(1).

■ Although Fiddler's opinion was a condition precedent to the closing of the RCA, and although this transaction took place in New York and was governed by New York law, BBL has not alleged that Fiddler was ever involved in the closing of that deal via telephone or otherwise. Nor did Fiddler's duties involve any representation in connection with the closing. Thus, unlike in *Schur* and *Parke–Bernet*, Fiddler never projected itself into New York to perform services in the state and never purposefully availed itself of the privileges and benefits of performing any services in the state. All of the relevant services in this case were in fact performed in Puerto Rico, and § 302(a)(1) jurisdiction is therefore inappropriate.

### (2) C.P.L.R. § 302(a)(2): *Tort Inside*

■ BBL next argues that the district court has personal jurisdiction over Fiddler pursuant to C.P.L.R. § 302(a)(2), which gives the court "personal jurisdiction over any non-domiciliary ... who in person or through an agent ... commits a tortious act within the state...." At min-

imum, to qualify for jurisdiction under this subsection, "a defendant's act or omission [must have] occur[red] within the State." *Kramer v. Vogl,* 17 N.Y.2d 27, 31, 267 N.Y.S.2d 900, 215 N.E.2d 159 (1966). BBL does not contend that any of Fiddler's agents were ever physically present in New York to commit a tortious act but instead argues that Fiddler committed a "tortious act in New York" by sending a fraudulent opinion to the banks in New York. (*See* BBL's Br. at 32–38.)

As BBL concedes, its position is plainly inconsistent with this Court's recent interpretation of § 302(a)(2) in *Bensusan Restaurant Corp. v. King,* 126 F.3d 25 (2d Cir.1997). In *Bensusan,* we held that a defendant's physical presence in New York is a prerequisite to jurisdiction under § 302(a)(2). We explained in *Bensusan* that *Feathers v. McLucas,* 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965), the seminal New York Court of Appeals case on long-arm jurisdiction:

> adopted the view that C.P.L.R. § 302(a)(2) reaches only tortious acts performed by a defendant who was physically present in New York when he performed the wrongful act. The official Practice Commentary to C.P.L.R. § 302 explains that "if a New Jersey domiciliary were to lob a bazooka shell across the Hudson River at Grant's tomb, *Feathers* would appear to bar the New York courts from asserting personal jurisdiction over the New Jersey domiciliary [under § 302(a)(2)] in an action by an injured New York plaintiff."

*Bensusan,* 126 F.3d at 28.

BBL asks us to revisit *Bensusan* and decide whether a defendant's physical presence is required under New York law when a defendant sends affirmative misrepresentations into the state. This is not the case for such a re-evaluation, however. BBL's theory of fraud is premised on the contention that Fiddler, by virtue of either its attorney-client relationship with the banks or its contract for legal services, acquired an affirmative duty to disclose any materially relevant information obtained during its attorney-client representation of Chase Puerto Rico on January 17, 1990. BBL is thus suing not for affirmative misrepresentations placed in the final opinion but rather for Fiddler's failure to transmit this information at all. Fiddler's actions were more akin to an omission than to an act of sending misrepresentations into the state, and under New York law,

> [t]he failure of a man to do anything at all when he is physically in one State is not an "act" done or "committed" in another State. His decision not to act and his not acting are both personal events occurring in the physical situs. That they may have consequences elsewhere does not alter their personal localization as acts.

*Platt Corp. v. Platt,* 17 N.Y.2d 234, 237, 270 N.Y.S.2d 408, 217 N.E.2d 134 (1966) (cited with approval in *Bensusan,* 126 F.3d at 28); *see also Ferrante Equip. Co. v. Lasker–Goldman Corp.,* 26 N.Y.2d 280, 285, 309 N.Y.S.2d 913, 258 N.E.2d 202 (1970). Any torts alleged in this case were thus localized in Puerto Rico, and § 302(a)(2) cannot serve as a proper basis for jurisdiction over Fiddler.

(3) C.P.L.R. § 302(a)(3): *Tort Outside/Injury Inside*

BBL next argues that the district court had personal jurisdiction over Fiddler under C.P.L.R. § 302(a)(3), which extends to any non-domiciliary who in person or through an agent:

> commits a tortious act without the state causing injury to person or property within the state . . . if he
>
> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
>
> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial reve-

nue from interstate or international commerce....

The district court declined to exercise personal jurisdiction under this subsection because, in its view, although the alleged torts of omission occurred in Puerto Rico, "the situs of the injury to [BBL] cannot be considered to have been New York." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, No. 96 Civ. 7233(LMM), 1998 WL 182434, at *3 (S.D.N.Y. Apr. 17, 1998). We disagree.

■ As the district court noted, courts determining whether there is injury in New York sufficient to warrant § 302(a)(3) jurisdiction must generally apply a situs-of-injury test, which asks them to locate the "original event which caused the injury." *See Hermann v. Sharon Hosp., Inc.*, 135 A.D.2d 682, 683, 522 N.Y.S.2d 581 (2d Dep't 1987). This "original event" is, however, generally distinguished not only from the initial tort but from the final economic injury and the felt consequences of the tort. *See, e.g., id.* at 583; *Fantis Foods, Inc. v. Standard Importing Co., Inc.*, 49 N.Y.2d 317, 425 N.Y.S.2d 783, 402 N.E.2d 122 (1980); *Kramer v. Hotel Los Monteros S.A.*, 57 A.D.2d 756, 757, 394 N.Y.S.2d 415 (1st Dep't 1977). New York case law must therefore be examined very carefully to understand how these "original events" are identified.

In *Hermann*, for example, a group of doctors practicing in Connecticut were alleged to have negligently injured a patient who was visiting from New York. The tort in *Hermann* occurred in Connecticut because the doctors performed all of the relevant medical services in Connecticut. The plaintiff, however, felt the consequences when she was back in New York. The court nevertheless refused to find injury in New York because "[t]he situs of injury is the location of *the original event which caused the injury,* not the location where the resultant damages are subsequently felt by plaintiff." *Id.* at 583 (emphasis added). The court viewed this "original event" as having occurred in Con-

necticut, where the plaintiff was located when she received the medical treatment, and where the first effects of the doctors' alleged negligence—whether felt or not—were inflicted.

In *Sybron Corp. v. Wetzel*, 46 N.Y.2d 197, 413 N.Y.S.2d 127, 385 N.E.2d 1055 (1978), the New York Court of Appeals examined a commercial tort far more analogous to those alleged by BBL. The plaintiff in this case was Sybron, a New York corporation that had employed Wetzel, one of the defendants, for approximately thirty-four years. During the course of his employment, Wetzel had learned various protected trade secrets from Sybron before retiring and moving to Florida. De Dietrich, a foreign corporation and the other defendant in the case, subsequently opened a glass lining facility in New Jersey and sought to hire Wetzel to supervise the facility. Sybron brought suit to enjoin this employment, alleging that De Dietrich was attempting to engage in unfair competition by hiring Wetzel to divulge Sybron's trade secrets.

The only jurisdictional question in this case was related to De Dietrich, *see id.* at 203, 413 N.Y.S.2d 127, 385 N.E.2d 1055, and the court noted from the start that the alleged tort by De Dietrich was to take place out of state, in New Jersey. The court thus discussed whether this tort might cause injury in New York sufficient for § 302(a)(3) jurisdiction. The court reasoned that if De Dietrich were to hire Wetzel to divulge trade secrets in New Jersey (and were to obtain the consequent ability to produce better quality goods at lower prices), this act would very likely directly affect the decisions of certain New York customers to buy from De Dietrich rather than Sybron. These decisions would, in turn, ultimately cause economic damage to Sybron. The court thus viewed some of the original events that would cause Sybron injury as located in New York, where the relevant customers' buy-

ing habits would first be altered.[4] *See also Cleopatra Kohlique, Inc. v. New High Glass, Inc.,* 652 F.Supp. 1254, 1257 (E.D.N.Y.1987) ("Even if plaintiff was domiciled in another state, the loss of New York customers would constitute a New York injury.").

▮ In the case of fraud or breach of fiduciary duty committed in another state, the critical question is thus where the first effect of the tort was located that ultimately produced the final economic injury. Although the alleged omissions in this case occurred in Puerto Rico, New York was the place where BBL first disbursed its funds to Arochem. BBL argues that it disbursed these funds only because it was unaware of the information that Chase Puerto Rico conveyed to Fiddler on January 17, 1990. It was also this disbursement that was the first step in the process that generated the ultimate economic loss to BBL. Much like Sybron's loss of New York customers, the disbursement of funds in this case was thus the first effect of the tort that caused the injury—or, alternatively stated, the "original event that caused the injury." *See also Hargrave v. Oki Nursery, Inc.,* 636 F.2d 897, 900 (2d Cir.1980) ("One immediate and direct 'injury' Oki's alleged tortious misrepresentations caused to plaintiffs was the loss of the money paid by them for the diseased vines. That injury was immediately felt in New York where plaintiffs were domiciled and doing business, where they were located when they received the misrepresentations, and where the vines were to be shipped."); *Marine Midland Bank v. Kep-*

*linger & Assocs., Inc.,* 488 F.Supp. 699, 703 (S.D.N.Y.1980) ("[S]ince all disbursements to ADDM or its creditors were made by MMB in New York, the situs of the injury was in New York."). *Cf. also Polish v. Threshold Technology, Inc.,* 72 Misc.2d 610, 340 N.Y.S.2d 354 (Sup.Ct. 1972) (finding jurisdiction under § 302(a)(2) over defendant who sent letter containing affirmative misrepresentation into New York because plaintiff perused fraudulent letter in the state and parted with stock certificates there in reliance on the letter). Courts examining cases involving misrepresentations have, in fact, often found that the situs of injury is New York when the original reliance or other first event causing the injury occurs in New York, even if the defendant has never sent any misrepresentations into the state. *See, e.g., Cleopatra,* 652 F.Supp. at 1256 (holding that misrepresentations made by defendant Fital in Italy, which were relied upon by a corporation in New York to buy certain mascara products, caused injury in New York); *Cavalier Label Co. v. Polytam, Ltd.,* 687 F.Supp. 872, 879 (S.D.N.Y. 1988) (holding that although "defendant's principals allegedly made the representations when they were in Israel, and during a meeting of the parties in Italy ... Plaintiff has adequately alleged injury within the state [for § 302(a)(3) purposes] by asserting the loss of New York customers"). Under the situs-of-injury test, the "original event" that caused the economic harm to BBL was thus the disbursement of the funds, and BBL's injury occurred in New York for § 302(a)(3) purposes.

4. In finding that the situs of injury was New York, the court stated not only that "the economic injury plaintiff seeks to avert stems from the threatened loss of New York customers" but that "it is New York where plaintiff manufactures and refined glass-lined equipment and the alleged trade secrets were acquired." *Sybron,* 46 N.Y.2d at 205, 413 N.Y.S.2d 127, 385 N.E.2d 1055. This language of "acquisition" might be read to suggest that the court premised § 302(a)(3) jurisdiction in part on the fact that a tort occurred in New York. This language was, however, only dicta. The only person who "took"

trade secrets from New York was Wetzel, but Wetzel did this before having any employment relationship with De Dietrich, and it was jurisdiction over De Dietrich, not Wetzel, that was at issue in the opinion. Moreover, the court was explaining why there was jurisdiction under § 302(a)(3) at this point, and § 302(a)(3) pertains only to torts outside New York that cause injury in the state. Because the court was not analyzing jurisdiction under § 302(a)(2)—which pertains to torts occurring in the state—the existence of a tort in New York was irrelevant to its analysis.

Fiddler tries to avoid § 302(a)(3) jurisdiction by arguing that the location of injury in this case should be determined not by means of the situs-of-injury test but rather under this Court's holding in *American Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.*, 439 F.2d 428 (2d Cir.1971). Fiddler reads *American Eutectic* as standing for the proposition that with regard to commercial torts, the location of injury should be determined not by finding the "original event that causes the injury" but on the basis of where "the critical events associated with the dispute took place." *Id.* at 433. Fiddler misreads our holding in *American Eutectic.* In *American Eutectic*, we examined a tort of unfair competition and held that the situs of injury was the place where the plaintiff *lost business*, which is a holding completely consistent with *Sybron* and with our present analysis of § 302(a)(3). In fact, we noted in *American Eutectic* that there might even be injury in New York when a defendant's loss of customers occurs *outside* the state, so long as "the discernible local impact of the commercial injury to plaintiff" in New York is great enough. *Id.* at 435. After we decided *American Eutectic*, the New York Court of Appeals also explicitly held that the situs-of-injury test applies to "commercial torts[, even] ... where the locus of injury is not as readily identifiable as it is in torts causing [ordinary] physical harm." *Sybron*, 46 N.Y.2d at 205, 413 N.Y.S.2d 127, 385 N.E.2d 1055. *American Eutectic* thus does nothing to bar application of the situs-of-injury test to commercial torts like the ones alleged in this case.

Meeting the situs-of-injury test is, however, not enough to establish jurisdiction under § 302(a)(3). A plaintiff must also meet one of two additional sets of requirements: under subpart (i), that the defendant "regularly ... solicit[ed] business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered" in New York; or under subpart (ii), that the defendant "should [have] rea-sonably expect[ed] the [tortious] act to have consequences in the state and derive[d] substantial revenue from interstate or international commerce."

Because the district court denied § 302(a)(3) jurisdiction after finding that the injury alleged in this case occurred outside of New York, the court never addressed the additional requirements for jurisdiction under subparts (i) or (ii) of this subsection. It is, moreover, unclear from the record whether discovery was ever fully completed on these issues. Further proceedings are therefore necessary to determine whether BBL can establish jurisdiction under § 302(a)(3), assuming that a tort has been adequately alleged.

### (4) Aider and Abettor and Co–Conspirator Doctrines

BBL also argues that personal jurisdiction is warranted under the common law co-conspirator and aider and abettor doctrines. The district court was correct to conclude that these doctrines "are not pertinent because the complaint does not allege that defendant conspired with, or aided and abetted, anyone (including Chase, which plaintiff seems to have in mind)." *Bank Brussels Lambert*, 1998 WL 182434, at *2. BBL also points to nothing other than conclusory statements to support the existence of a conspiracy or aider and abettor relationship. *See Lehigh Valley Indus., Inc. v. Birenbaum*, 527 F.2d 87, 93 (2d Cir.1975) ("New York law seems to be clear that the bland assertion of conspiracy or agency is insufficient to establish jurisdiction [under the co-conspirator and aider and abettor doctrines]."); *see also Lamarr v. Klein*, 35 A.D.2d 248, 250–51, 315 N.Y.S.2d 695 (1st Dep't 1970) (holding that conclusory statements about defendant's role in conspiracy were insufficient to establish jurisdiction under the co-conspirator doctrine). Jurisdiction is therefore inappropriate under these common law doctrines.

794

## CONCLUSION

For the reasons discussed, we affirm the district court's denial of personal jurisdiction over Fiddler on the basis of C.P.L.R. § 302(a) subsections (1) and (2) and under the common law aider and abettor and co-conspirator doctrines. We find, however, that (assuming *arguendo* that there has been a tort) the injury alleged in this case took place in New York, where BBL first disbursed its funds in connection with the RCA transaction, and that the district court therefore denied § 302(a)(3) jurisdiction on an erroneous ground. We also note, however, that Fiddler may have had a duty not to disclose to BBL information received from another client in another representation. Consequently, BBL may not have averred sufficient facts to establish a tort in this case, as is required for jurisdiction under § 302(a)(3). We therefore remand to determine whether BBL has sufficiently averred an actionable tort, whether the requirements for jurisdiction under subparts (i) or (ii) of § 302(a)(3) have also been met, and, if both of these questions are answered in the affirmative, whether an exercise of jurisdiction in this case would comport with federal due process requirements.