**MARINE MIDLAND BANK, Plaintiff,**

v.

**KEPLINGER & ASSOCIATES, INC. and J.W. Miller & Associates, Inc., Defendants.**

No. 79 Civ. 4618 (KTD).

United States District Court, S. D. New York.

March 25, 1980.

Sullivan & Cromwell, New York City, for plaintiff; John Dickey, D. Stuart Meiklejohn, New York City, of counsel.

Gottesman, Wolgel, Smith & Secunda, New York City, for defendant Keplinger & Associates, Inc.; Harold H. Wolgel, Bart J. Klein, New York City, of counsel.

Olshan, Grundman & Frome, New York City, for defendant J.W. Miller & Associates, Inc.; Richard H. Abelson, New York City, of counsel.

## OPINION AND ORDER

KEVIN THOMAS DUFFY, District Judge:

Plaintiff, Marine Midland Bank [hereinafter referred to as "MMB"], commenced this action against the defendants, Keplinger & Associates, Inc. [hereinafter referred to as "Keplinger"], and J.W. Miller & Associates, Inc. [hereinafter referred to as "Miller"], charging them with negligence, breach of contract and material misrepresentations of fact. The charges emanate from MMB's financing of a Utah coal mining project which was allegedly based upon certain information and reports submitted to it by Miller and Keplinger concerning the quantity and quality of recoverable coal.

In the summer of 1977, a group of investors, later to form the partnership of Atlas-Dirty Devil Mining, sought financial backing from MMB for the development of a Utah coal mine to be owned and operated by the partnership. Before advancing any monies, however, MMB wanted assurance that the potential coal recoveries were sufficient in quantity and quality to safeguard its investment.

To this end, MMB secured the geological report on the Atlas-Dirty Devil Mining Project [hereinafter the "ADDM project"], which was prepared by J.W. Miller & Associates, Inc. [hereinafter the "Miller report"]. The Miller report recited, *inter alia*, that the development of the Utah mine could yield a recovery of nearly 27 million tons of clean coal. In order to interpret and verify the geological data upon which this conclusion was based, MMB sought the services of an expert coal consultant.

After a telephonic communication between one of MMB's vice presidents and H.F. Keplinger, President of Keplinger & Associates, Inc., it was agreed that Keplinger's firm would review all the geological data of the ADDM project and report to MMB on the potential coal recoveries. The report [hereinafter the "Keplinger's report"], issued in August, 1977, contained the following:

(1) The procedures employed in the calculation of coal reserves have been executed according to standard professional procedures and are supported by adequate drilling data. However, the data used for the calculations were not obtained under supervision of Keplinger and Associates, Inc.

(2) The data submitted on the quality of coal have been reviewed. A reputable testing laboratory conducted all analyses and sufficient coring and trenching have been undertaken to indicate the quality expected to be produced during mining operators [sic] of the subject properties. Again, the samples submitted for testing were not obtained under supervision of Keplinger and Associates, Inc.

(3) The mine plan has been well developed by a consultant with acceptable coal mining experience and has been prepared according to standard professional procedures of equipment selection, construction and operation.

(4) The mine plan is based on contract mining. This is potentially the weakest part of the entire proposed project.

. . .

In general, the results of our review of the information submitted suggest that: 1) reserves are adequate for large-scale surface mining; 2) coal quality, after washing, will meet consumer requirements; 3) adequate operational planning has been executed in the project to date; 4) all state and federal approvals have been obtained; and 5) cost estimates of capital requirements are realistic.

However, the effectiveness and reliability of the contract miner is in question at this date. The productivity and hence profitability of the entire project depends directly on the contract miner; contractural [sic] agreements should be made between Atlas Resources and Hunts Service Construction Company. Provisions should also be made by Atlas Resources to anticipate any operational problems with the contract miner by developing contingency plans for back-up contract mining, perhaps via their consultant J.W. Miller and Associates.

Our analysis of the proposed project indicates that with a prudent and effective management and maintenance of the operations, a profitable surface coal mining operation could be operated on the subject properties, with considerable potential for expanded operations if the neighboring federal leases are obtained.

It should be emphasized that our evaluation is preliminary in nature. Subsequent information could alter our opinions substantially. If the project is funded and operations are commenced, we suggest that periodic inspections be made on your behalf to assess the project's development and evaluate its on-going potential profitability. We would be pleased to continue as your consultants in this project.

Thereafter, in October and November, 1977, MMB entered into loan agreements with the Atlas-Dirty Devil partnership. These agreements called for the disbursement of funds by MMB to the partnership or directly to its creditors for costs and expenses arising out of the ADDM project.

During the following year, MMB continued to finance the ADDM project to the tune of $8 million. And, from time to time during this period, Keplinger would report to MMB in New York on the status of the project.

As it developed, however, by the fall of 1978 the ADDM project began to go sour. It became apparent that the recoverable coal from the project was simply not the quality necessary to make the mine a profitable enterprise. MMB confirmed this grim conclusion through Keplinger's later reports. The Atlas-Dirty Devil partnership has since filed a petition under Chapter XI of the Bankruptcy Act.

Plaintiff commenced the instant action to recover the more than $8 million it advanced to develop the Utah mine. MMB reasons that all advances to the ADDM project were based upon the apparently er-

roneous premise that the information contained in the Miller and Keplinger reports was accurate. MMB concludes that since it reasonably relied upon the proffered geological and interpretive expertise of Miller and Keplinger in financing the ADDM project, both Miller and Keplinger should be made to respond in damages for all losses incurred.

Keplinger has now moved to dismiss the action for want of personal jurisdiction or, in the alternative, to have the entire action transferred for trial to the Southern District of Texas or to grant Keplinger a severance and try all claims asserted against it in Texas while the instant action proceeds against Miller in New York.

Plaintiff opposes the instant motions on the ground that New York has personal jurisdiction over Keplinger by virtue of its long-arm statute, N.Y.Civ.Prac.Law § 302 (McKinney 1980).

More particularly, plaintiff argues that there are two separate provisions of the long-arm statute which render Keplinger subject to personal jurisdiction in New York. First, plaintiff urges that Keplinger entered into a contract to supply services in New York. § 302(a)1. Plaintiff also argues that Keplinger committed a tortious act outside of New York which caused injury in New York and which was reasonably foreseeable. § 302(a)3.

Plaintiff also asserts that New York is the appropriate forum and opposes Keplinger's request for a transfer of the entire action or a partial severance.

For the reasons stated below, each of Keplinger's motions must be denied.

The defendant Miller has taken no position with respect to Keplinger's jurisdictional motions but does oppose the transfer of the action or the severance of its codefendant.

Keplinger's jurisdictional attack is two-pronged. First, it argues that the provisions of the long-arm statute offer no jurisdictional predicate over it. It further urges that if the terms of the jurisdictional statute were expanded to ensnare it, this expansion would certainly be violative of due process.

The long-arm statute provides in pertinent part:

(a) As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

. . .

3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce;

In count two of its complaint, MMB charges that Keplinger agreed to ply its interpretive expertise on behalf of MMB by reviewing the Miller geological report and other available data concerning the potential coal recovery of the ADDM project. However, the complaint charges that despite this promise to perform, Keplinger breached its contract by failing to employ the "standard professional procedures" in reviewing this data.

The substance of plaintiff's "contractual" claim is that the information in the report was erroneous and it was plaintiff's reliance upon these misrepresentations which caused it financial injury. Thus, despite plaintiff's attempt to cloak its second claim in contractual terms, the essence of the claim is Keplinger's alleged misrepresentations and is tortious in nature.

Thus, when viewed in this light plaintiff's second claim must be tested against § 302(a)3, an analysis to which I now turn.

Counts one and three of the complaint charge Keplinger with having made "grossly negligent misrepresentations" in its report to the detriment of plaintiff. This is also the essence of the charge alleged in count two. MMB concludes that these grossly negligent misrepresentations constitute tortious conduct which caused injury in New York and which were sufficient, under § 302(a)3, to render Keplinger subject to personal jurisdiction in New York. I agree.

It is now apparent that commercial misrepresentations, such as are alleged in the case at bar, may, in an appropriate case, constitute tortious conduct within the purview of § 302(a)3 of the long-arm statute. *Lehigh Valley Industries, Inc. v. Birenbaum*, 389 F.Supp. 798, 804 (S.D.N.Y.), *aff'd*, 527 F.2d 87 (2d Cir. 1975). *See also White v. Guarente*, 43 N.Y.2d 356, 372 N.E.2d 315, 401 N.Y.S.2d 474 (1977). Indeed, it is now settled in New York that where a defendant knowingly sends a false statement into a state intending that it be relied upon, he has, for jurisdictional purposes, acted outside the state. *Kramer v. Vogl*, 17 N.Y.2d 27, 215 N.E.2d 159, 267 N.Y.S.2d 900 (1966). And where the misrepresentation causes an injury in New York and the additional New York contacts obtain, long-arm jurisdiction will lie.

In the case at bar, there can be no doubt that plaintiff's allegations, if true, are sufficient to state a claim for tortious conduct. Likewise, assuming the accuracy of the complaint, if MMB agreed to finance the ADDM project relying upon Keplinger's favorable report thereof, it most assuredly was financially damaged. And, since all disbursements to ADDM or its creditors were made by MMB in New York, the situs of the injury was New York.

With respect to the additional New York contacts required under § 302(a)3, these too have been amply met.

Under § 302(a)3(ii) the person who commits the out of state tortious act must expect or reasonably expect the act to have consequences in New York and also derive substantial revenue from interstate or international commerce.

There can be no doubt that Keplinger reasonably expected its report to have consequences in New York. To be sure, the contract was to obtain a report upon which MMB could make an investment decision. Indeed, the Keplinger promotional booklet outlining its professional qualification is particularly germane in this regard. It provides in part:

Reports made by the firm include market demand, lifting costs, energy requirements, evaluation of oil and gas securities, crude oil pricing, economic productive limit, etc. These reports are designed for individuals, industry, financial and investment groups, U.S. and foreign governments. *They frequently serve as the basis for financing, purchase or sales of properties or companies.*

Plaintiff's Exhibit A at 6 (emphasis added).

Keplinger can hardly argue that it did not anticipate MMB's reliance upon its report. Nor can it argue, based upon the language quoted above, that this reliance was unreasonable. Keplinger holds itself out as an expert in the area and in fact encourages such reliance upon its reports.

Similarly, the Keplinger booklet boasts of national and international prominence in the geological area. Indeed, in touting its international expertise, Keplinger boasts in its promotional booklet:

Clients have employed The Keplinger Companies in every geographical area of the United States and on every continent.

The organization has provided professional reports on the engineering, geology and geophysics of numerous fields, refineries and petrochemical plants in all parts of the world. The Keplinger Companies have made studies and analyses in all climates. The Keplinger Companies have compiled reports in many foreign languages. These studies have been acclaimed by experts in the industry, as well as those for whom the studies were made.

Plaintiff's Exhibit A at 12.

By its own admission, therefore, Keplinger is a national and international organiza-

tion. And, since MMB alone paid Keplinger in excess of $300,000, given its numerous corporate clients throughout the United States and the world, it is apparent that it derives substantial revenues from interstate and international commerce.

 Keplinger's final jurisdictional attack is that application of § 302 to the instant action would violate due process. I disagree.

In addition to meeting the requirements of § 302(a)3, Keplinger does energy consultation work for several New York corporations. These corporate clients have been recited in the firm's promotional booklet. See Plaintiff's Exhibit A. In fact, in connection with these additional New York consultations, Keplinger's president has traveled to New York.

Under these circumstances, there are sufficient Keplinger contacts with New York to meet the dictates of due process. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

Thus, since at least one of the provisions of New York's long-arm statute does confer personal jurisdiction over Keplinger, its jurisdictional attack must fail.

Keplinger's request for change of venue or a severance must also be denied. It is clear that this jurisdiction is at least as convenient for all the parties as a Texas forum. Since New York is the forum chosen by plaintiff, it will not be displaced absent compelling reasons which are totally lacking in the case at bar.

Furthermore, Keplinger's co-defendant opposes a transfer and a severance of Keplinger. It argues that the questions and claims presented against it and Keplinger are virtually identical and so woven together that the ends of justice demand that they be vindicated in a single jurisdiction. I agree.

Accordingly, Keplinger's motion to dismiss is denied as are its motions for a change of venue or a severance.

SO ORDERED.