Timothy DAVIS, Plaintiff,

v.

MASUNAGA GROUP, INC., et al., Defendants.

No. 02 CIV. 0909(LAK).

United States District Court, S.D. New York.

May 22, 2002.

**658**

William J. Ferrall, Lapidus & Smith, LLP, New York City, for Plaintiff.

M. William Munno, Seward & Kissell LLP, New York City, Michael E. Reznick, McBirney & Chuck, Agoura Hills, CA, for Defendant Masunaga Group, Inc.

## MEMORANDUM OPINION

KAPLAN, District Judge.

The amended complaint in this case alleges that plaintiff, formerly a sales representative for defendant Masunaga Group, Inc. ("MGI") entered into an agreement settling an employment discrimination claim he had against it in 2001, but that MGI's chief executive officer, Stephan Ellingson, thereupon began "a pattern of relentless telephone harassment of [plaintiff], presumably in retaliation for [plaintiff] having negotiated a settlement with MGI ...." [1] Plaintiff charges that there were at least two dozen such calls and that they were made from Ellingson's home, his MGI offices, his company cell phones, and hotels he visited while on MGI business.[2] MGI now moves to dismiss the complaint for lack of personal jurisdiction or, alternatively, to transfer the action to the Central District of California pursuant to 28 U.S.C. § 1404(a).

### I.  Personal Jurisdiction

According to MGI's affidavit, to which plaintiff has not responded, MGI is a California corporation with its principal place of business in Thousand Oaks, California.[3] It has no connections whatsoever with the State of New York.[4] Similarly, Ellingson, until he left MGI's employment, resided in Ventura County, California.[5] There is no suggestion, either in the amended complaint or elsewhere, that any of the alleged harassing telephone calls originated in New York, and it is undisputed that all of the locations from which plaintiff claims they were made were in California, save that the record is silent as to the locations of the hotels from which calls were made. Thus, there is no allegation and no evidence that any of the alleged conduct of which plaintiff complains took place in the State of New York.

In the circumstances, personal jurisdiction over MGI depends upon whether the provisions of Section 302 of the CPLR, the New York long arm statute, have been satisfied. The relevant portions of the statute are Section 302(a), subdivisions 2 and 3.

Section 302(a), subd. 2, permits the exercise of personal jurisdiction over an out-of-state defendant who "commits a tortious act within the state" as to a cause of action arising therefrom. As the Second Circuit has written:

> "In *Feathers v. McLucas,* 15 N.Y.2d 443, 458, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965), the Court held that the language 'commits a tortious act *within* the state,' as contained in sub-paragraph (a)(2), is 'plain and precise' and confers personal jurisdiction over non-residents '*when they commit acts within the state.*'" *Id.*

---

1.  Am. Cpt. ¶ 10.

2.  *Id.* ¶ 11.

3.  Hamamatsu Aff. ¶ 2.

4.  *Id.* ¶ 4.

5.  *Id.* ¶ 6.

at 460, 261 N.Y.S.2d·8, 209 N.E.2d 68 (internal quotation marks omitted). *Feathers* adopted the view that CPLR § 302(a)(2) reaches only tortious acts performed by a defendant who was physically present in New York when he performed the wrongful·act. The official Practice Commentary to CPLR § 302 explains that 'if a New Jersey domiciliary were to lob a bazooka shell across the Hudson River at Grant's tomb, *Feathers* would appear to bar the New York courts from asserting personal jurisdiction over the New Jersey domiciliary in an action by an injured New York plaintiff.' C302:17. The comment goes on to conclude that:

"As construed by the *Feathers* decision, jurisdiction cannot be asserted over a nonresident under this provision unless the nonresident commits an *act* in this state. This is tantamount to a requirement that the defendant or his agent be physically present in New York· .... In short, the failure to perform a duty in New York is not a tortious act in this state, under the cases, unless the defendant or his agent enters the state.

"The Court of Appeals adhered to the *Feathers* holding in *Kramer v. Vogl,* 17 N.Y.2d 27, 31, 267 N.Y.S.2d 900, 215 N.E.2d 159 (1966), and again in *Platt Corp. v. Platt,* 17 N.Y.2d 234, 237, 270 N.Y.S.2d 408, 217 N.E.2d 134 (1966), where it said:

"The failure of a man to do anything at all when he is physically in one State is not an 'act' done or 'committed' in another State. His decision not to act and his not acting are both personal events occurring in the physical situs. That they may have consequences elsewhere does not alter their personal localization as acts.

*See also Ferrante Equip. Co. v. Lasker-Goldman Corp.,* 26 N.Y.2d 280, 285, 309 N.Y.S.2d 913, 258 N.E.2d. 202 (1970).

"In *Harvey v. Chemie Grunenthal, G.m.b.H,* 354 F.2d 428, 431 (2d Cir. 1965), *cert. denied,* 384 U.S. 1001, 86 S.Ct. 1923, 16 L.Ed.2d 1015 (1966), we held·that this construction of sub-paragraph (a)(2) should be followed. Numerous lower courts, both state and federal, have arrived at the same conclusion. *See Beckett v. Prudential Ins. Co.,* 893 F.Supp. 234, 239 (S.D.N.Y. 1995); *Kinetic Instruments, Inc. v. Lares,* 802 F.Supp. 976, 982–83 (S.D.N.Y.1992); *Department of Economic Dev. v. Arthur Andersen & Co.,* 747 F.Supp. 922, 929 (S.D.N.Y.1990); *Van Essche v. Leroy,* 692 F.Supp. 320, 324 (S.D.N.Y.1988); *Rolls–Royce Motors, Inc. v. Charles Schmitt & Co.,* 657 F.Supp. 1040, 1052–53 (S.D.N.Y.1987); *Bulk Oil (USA) Inc. v. Sun Oil Trading Co.,* 584 F.Supp. 36, 40–41 (S.D.N.Y. 1983); *Paul v. Premier Elec. Constr. Co.,* 576 F.Supp. 384, 389 (S.D.N.Y. 1983); *Bialek v. Racal–Milgo,·Inc.,* 545 F.Supp. 25, 35 (S.D.N.Y.1982); *Selman v. Harvard Medical Sch.,* 494 F.Supp. 603, 612–13 (S.D.N.Y.), *aff'd mem.,* 636 F.2d 1204 (2d Cir.1980); *Marine Midland Bank v. Keplinger & Assocs., Inc.,* 488 F.Supp. 699 (S.D.N.Y.1980); *Lynn v. Cohen,* 359 F.Supp. 565, 568 (S.D.N.Y.1973); *Bauer Indus. Inc. v. Shannon Luminous Materials Co.,* 52 A.D.2d 897, 897–98, 383 N.Y.S.2d 80 (2d Dep't 1976) (mem.); *Glucoft v. Northside Sav. Bank,* 86 Misc.2d 1007, 1008–09, 382 N.Y.S.2d 690 (1976); *Gluck v. Fasig Tipton Co.,* 63 Misc.2d 82, 84, 310 N.Y.S.2d 809 (N.Y.Sup.Ct.1970); *Balogh v. Rayner–Smith,* 51 Misc.2d 1089, 1092, 274 N.Y.S.2d 920 (N.Y.Sup.Ct. 1966).

"In 1990, Judge McLaughlin, who wrote the above-quoted commentary on section 302(a)(2), further evidenced his belief that the commentary correctly interpreted the statute when he quoted its

substance in *Twine v. Levy*, 746 F.Supp. 1202, 1206 (E.D.N.Y.1990). As recently as 1996, another of our district judges flatly stated:

> "To subject non-residents to New York jurisdiction under § 302(a)(2) the defendant must commit the tort while he or she is physically in New York State.

*Carlson v. Cuevas*, 932 F.Supp. 76, 80 (S.D.N.Y.1996)(Baer, J.)." [6]

Here, there is neither allegation nor evidence that any of the alleged tortious telephone calls was made while the caller was in the State of New York. In consequence, the requirements of Section 302(a), subd. 2, are not satisfied as to MGI.

The only other possible basis for the assertion of personal jurisdiction over MGI is Section 302(a), subd. 3, of the CPLR, which provides in relevant part for the assertion of personal jurisdiction with respect to claims arising from the commission of "a tortious act without the state causing injury to person ... within the state ... if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce ...." [7]

Here, movant does not now dispute that the complaint alleges tortious acts without the state. The pivotal question is whether they caused injury to plaintiff within the state, and on this issue the movant properly points to the fact that the statute has been construed narrowly.[8] It argues that "the situs of the injury is the location of the original event which caused the injury" [9] and suggests that the "original events" are the placement of the telephone calls. This view, which equates "the original event which caused the injury" [10] with the defendant's wrongful act, lacks merit. The better view is that the original event causing the injury was the plaintiff's perception or receipt of the remarks allegedly made over the telephone by Ellingson.

■■■ Movant is correct that an injury resulting from an out-of-state tort does not have its situs in New York merely by virtue of the fact that the injured party resides in the state and suffers pecuniary or other loss here.[11] Rather, the situs of the injury is "where the critical events associated with the dispute took place." [12] However, the narrow construction of Section 302(a), subd. 3, invoked by movant is aimed at distinguishing original injury inflicted in the state, which is "injury" within the meaning of the statute, from mere felt consequences in the state, which are not.[13] This construction is not intended to tie inextricably the "original event" or "criti-

---

**6.** *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 28 (2d Cir.1997) (emphasis in original).

**7.** N.Y. C.P.L.R. § 302(a), subd. 3(i), (ii).

**8.** MGI Mem. 11–12.

**9.** *Twine v. Levy*, 746 F.Supp. 1202, 1206 (E.D.N.Y.1990); *see Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 791 (2d Cir.1999).

**10.** *Bank Brussels Lambert*, 171 F.3d at 791 (internal quotation marks omitted).

**11.** *See Palace Exploration Co. v. Petroleum Dev. Co.*, 41 F.Supp.2d 427, 435 (S.D.N.Y. 1998).

**12.** *Id.*

**13.** In personal injury cases, the relevant location is where the injury is inflicted upon the plaintiff, not the location of the defendant when he or she commits the tortious act at issue. *See, e.g., Carte v. Parkoff*, 152 A.D.2d 615, 616, 543 N.Y.S.2d 718 (2d Dept.1989) (finding that original event occurred in New Jersey when plaintiff, a New York resident, received allegedly negligent treatment from

cal event." with the situs of the defendant's tortious conduct.[14] As the Second Circuit recently noted in *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, "[the] 'original event' is ... generally distinguished not only from *the initial tort* but from the final economic injury and the felt consequences of the tort." [15]

Particularly illustrative are fraud cases involving out-of-state misrepresentations that subsequently are sent or transmitted into the state with an intent that they be relied upon here. It is well-settled in the Second Circuit that "plaintiff's reliance in New York on defendant's [out-of-state] misrepresentation fixes the situs of the injury in New York." [16] In *Hargrave v. Oki Nursery, Inc.*,[17] the seminal case on this issue, the plaintiffs alleged that the defen-

dant, a California corporation, had misrepresented the condition of wine grapes that subsequently were discovered to be diseased. The plaintiffs, relying on the alleged misrepresentations, purchased the vines which then were shipped to New York by the defendant. The defendant claimed that the "injury" was located in California because that was where the infection of disease would have occurred.[18] The Second Circuit rejected this argument, concluding that the injury to the vines was irrelevant. Rather, the tort was making false statements received by the plaintiffs in New York, and the "immediate and direct" injury caused by the misrepresentations was the loss of money paid to the defendant by the plaintiffs in New York.[19] The panel emphasized that the "in-

---

dentist in New Jersey); *Hermann v. Sharon Hosp., Inc.*, 135 A.D.2d 682, 683, 522 N.Y.S.2d 581 (2d Dept.1987) (finding the "original event" occurred in Connecticut, where the plaintiff was located when she received medical treatment from defendants, and where the first effects of the doctors' alleged negligence—whether felt or not—were inflicted).

Of course, in the mine run of personal injury cases, the defendant will be in the same location as the plaintiff when the injury originally is inflicted. However, the New York practice commentaries provide a helpful example for those situations where, as here, the defendant and plaintiff are in different locations at the time the injury is inflicted upon the plaintiff:

Assume, for example, that an electrical power tool defectively manufactured in Kansas exploded and burned the plaintiff in New York. Obviously, this is a case of injury within the state. What if the tool, which was originally shipped to New York, exploded and burned the New York resident while she was doing repair work at her cousin's house in Connecticut? If she continues to experience pain and suffering upon her return to New York, perhaps losing income due to an inability to work at her New York place of employment, has there been "injury within the state"? On such facts, the answer is plainly "no."

Vincent C. Alexander, *Practice Commentaries* C302:11, *in* 7B McKinney's Consolidated Laws of New York 155 (2001).

**14.** Indeed, movant's interpretation of the "original event" would make Section 302(a), subd. 3, superfluous in many cases because it would require commission of the relevant tort in New York, thus satisfying Section 302(a), subd. 2.

**15.** *Bank Brussels Lambert*, 171 F.3d at 791 (emphasis added); *accord Distefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir.2001).

**16.** *Palace Exploration Co.*, 41 F.Supp.2d at 435.

**17.** 636 F.2d 897 (2d Cir.1980).

**18.** *Id.* at 899.

**19.** *Id.* at 899–900. Similarly, in *Palace Exploration Co.*, an agent of the defendant corporation, located in Oklahoma, represented over the telephone to a New York plaintiff that the cost to drill an oil well in Oklahoma would be $280,000. Based in part on this representation, the plaintiff agreed to purchase a 50% interest in the well for a purchase price of $20,000 plus one-half of the costs of drilling. *See* 41 F.Supp.2d at 431. When costs turned out to be significantly more than anticipated

jury was immediately felt in New York where plaintiffs were domiciled and doing business, where they were located when they received the misrepresentations, and where the vines were to be shipped."[20] While the fraud context is distinct from the present one, Ellingson's alleged statements would appear to have caused an even more "immediate and direct" injury upon their receipt in the state because, if plaintiff's allegations are credited, the purpose of the statements was to hurt and harass the recipient, not to trigger some further activity that might be directed toward or take place in another state.

Moreover, a view of the statute allowing for personal jurisdiction in these circumstances is consistent with common sense. Assuming the truth of the allegations of the complaint, MGI's chief executive officer deliberately placed telephone calls to the plaintiff in New York that were intended to harass him or, at least, that were likely to have had that effect. In other words, Ellingson intended to cause plaintiff's emotional distress and intended that it be felt here.[21] To say that the New York courts lack jurisdiction over an out-of-state defendant in an intentional tort case such as this on the ground that the situs of the injury is outside the state would be nonsensical.[22]

■ In view of the fact that the complaint alleges that Ellingson made about twenty telephone calls as part of the alleged course of harassment, there is no serious question that it asserts a "persistent course of conduct" within the meaning of Section 302(a), subd. 3(i). The requirement that the defendant in question have satisfied the requirements of subsection (i) or (ii) is met if the defendant did so itself

---

and the plaintiff sued in New York, the defendant argued that the plaintiff did not suffer injury in New York because the event which caused the injury was the difficulty in drilling the well in Oklahoma. *Id.* at 435. The court rejected the defendant's argument, reasoning that the payment of money by the plaintiff from New York in reliance on the defendant's alleged misrepresentations satisfied the in-state injury requirement for purposes of Section 302(a), subd. 3.

**20.** *Hargrave,* 636 F.2d at 899–900.

**21.** Although the defendant's intent to cause *consequences in the state* and the foreseeability of those consequences are more specifically relevant to satisfaction of subsection (ii) of Section 302(a), subd. 3, *see, e.g., LaMarca v. Pak–Mor Mfg. Co.,* 95 N.Y.2d 210, 214, 713 N.Y.S.2d 304, 735 N.E.2d 883 (2000) ("The fourth element—contemplating "in-State consequences"—is met when '[t]he nonresident tortfeasor expect[s], or ha[s] reason to expect, that his or her tortious activity in another State will have *direct* consequences in New York.' ") (alteration in original (quoting *Ingraham v. Carroll,* 90 N.Y.2d 592, 598, 665 N.Y.S.2d 10, 687 N.E.2d 1293 (1997))), these factors have some relevance to the situs-of-the-injury determination as well. *See, e.g.,*

*Hargrave,* 636 F.2d at 900 ("In this case the immediate consequences which Oki foresaw, indeed which it sought to bring about by its sales representations, was payment to it directly by a New York domiciliary. Nothing could be a "closer" or more "direct" result from Oki's representations than the extraction of money from plaintiffs in New York."); *Briley v. Blackford,* No. 89 Civ. 8365(PNL), 1990 WL 124341, at *9 (S.D.N.Y. Aug. 21, 1990) ("[T]he location of the injury must be a direct and reasonably foreseeable result of defendants' wrongful acts outside the forum. When the injury suffered by a plaintiff resulting from the commercial tort is suffered within the forum, but would have occurred wherever the plaintiff was domiciled or chose to travel, the injury cannot be said to be within the forum so as to justify personal jurisdiction over the defendant.").

**22.** *See Matter of M.P. v. M.S.,* 186 Misc.2d 173, 175, 715 N.Y.S.2d 831, 832 (2000) (holding that New York plaintiff's fear, resulting from alleged death threat made to her in New York over the telephone from Florida, constituted injury within the state for purposes of Section 302(a), subd. 3); *cf. Calder v. Jones,* 465 U.S. 783, 788, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) (sustaining against due process challenge exercise of personal jurisdiction

or "through an agent." [23] As Ellingson at the time was the chief executive officer, and therefore an agent, of MGI, the allegations and evidence now before the Court is sufficient to require the conclusion, at least for present purposes, that Section 302(a), subd. 3(i), is satisfied.

There remains the question whether the exercise of personal jurisdiction over MGI is consistent with the Due Process Clause. As a rule, this is an unnecessary step in the analysis, as the New York long arm statute is narrower than the limits permitted by due process, so consistency with due process typically is implicit in a conclusion that the long arm statute is satisfied.[24] As our Circuit perhaps has been less than consistent on this point, however,[25] the point must be dealt with. In light of *Calder v. Jones*,[26] however, it is not open to serious dispute on the facts of this case.

## II. Transfer

That brings us to the alternative motion to transfer. Section 1404(a) permits transfer for the convenience of the parties and witnesses and in the interest of justice provided the action might have been brought in the proposed transferee district.[27] The latter requirement plainly is satisfied here, as the defendants both reside in the Central District of California. Hence, the issue is one of convenience.

The factors pertinent to that determination are too well established to warrant

repetition.[28] Suffice it to say that this is not a close case. The operative facts here occurred both in California and New York—the calls were made in the former and received and their impact felt in the latter. New York is a more convenient forum for the plaintiff, California for the defendants. There has been no showing that California would be a superior venue with respect to access to proof or the availability of compulsory process for unwilling witnesses; indeed, no unwilling witness has been identified. There is no reason to suppose that California would be a more efficient trial location. In short, what MGI asks the Court to do is to shift the burden of litigating on the other side of the country from it to the plaintiff. There is no basis for doing so, particularly as plaintiff's choice of forum, which is entitled to significant weight, was not at all capricious but grounded in his residence here. There is no basis for transfer under Section 1404(a).

## III. Forum Selection Clause

■ MGI's final argument is that the case should be transferred to California because the settlement agreement between the parties provides that "[a]ny action ... arising out of or relating to this Agreement shall be brought in the county of Los Angeles, State of California, and each party hereto irrevocably consents to such jurisdiction and venue, and waives any claim of inconvenient forum." [29] MGI argues that this case "relat[es] to" the settlement agreement because the amended complaint asserts that the agreement "presumably" was the motive for Ellingson's actions.[30]

---

against out-of-state libel defendant where alleged libel directed at in-state resident).

**23.** N.Y. C.P.L.R. § 302(a).

**24.** *E.g., Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.,* 174 F.Supp.2d 170, 173 & n. 14 (S.D.N.Y.2001) (citing cases).

**25.** *Cf. Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.,* 264 F.3d 32 (2d Cir.2001) (affirming conclusion that long arm statute satisfied but remanding for consider-

ation of due process issue without consideration of the foregoing point).

**26.** 465 U.S. at 788, 104 S.Ct. 1482.

**27.** 28 U.S.C. § 1404(a).

**28.** *E.g., Coker v. Bank of Am.,* 984 F.Supp. 757, 764 (S.D.N.Y.1997).

**29.** Hamamatsu Aff. Ex. B.¶ 12.

**30.** Am. Cpt. ¶ 10.

In this Court's view, the argument is unpersuasive.

Choice of forum clauses ordinarily are to be enforced.[31] The critical question is whether this action falls within the scope of this clause. To further the strong public policy in favor of forum selection clauses, courts have construed them to encompass claims beyond breach of the contract containing the clause.[32] "Whether a forum selection clause encompasses claims beyond breach of contract depends on the plain language of the forum selection clause itself." [33]

Although each clause requires an individualized inquiry, courts have established certain guiding principles. Judge Stein recently summarized the cases attempting to define when a contractually based forum selection clause includes other claims:

"[a] forum selection clause should not be defeated by artful pleading of claims not based on the contract containing the clause if those claims grow out of the contractual relationship. Thus, the circuit courts have held that a contractually-based forum selection clause will also encompass tort claims if the tort claims ultimately depend on the existence of the contractual relationship between the parties, or if resolution of the claims relates to interpretation of the contract, or if the tort claims involve the same operative facts as a parallel claim for breach of contract."

"Regardless of the differences in terminology, one common thread running through these various formulations is the inquiry whether the plaintiff's claims depend on rights and duties that must be analyzed by reference to the contractual relationship." [34]

Here, the language of the forum selection clause is broad, but the relationship between plaintiff's claims and the settlement agreement is too attenuated to trigger application of the clause. Plaintiff's claims are in no way ancillary to any claim of breach of the settlement agreement, and

---

**31.** E.g., *Composite Holdings, LLC v. Westinghouse Elec. Corp.,* 992 F.Supp. 367, 368–69 (S.D.N.Y.1998).

**32.** See, e.g., *Roby v. Corp. of Lloyd's,* 996 F.2d 1353, 1361 (2d Cir.) ("We ... reject the ... contention that only allegations of contractual violations fall within the scope of the [forum selection] clause ...."), *cert. denied,* 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993); *Bense v. Interstate Battery Sys.,* 683 F.2d 718, 720 (2d Cir.1982) (holding that a forum selection clause that applied to "causes of action arising directly or indirectly from [the agreement]" covered both breach of contract claims and federal antitrust claims).

**33.** *U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras,* No. 98 Civ. 3099(JGK), 2001 WL 300735, at *18 (S.D.N.Y. Mar. 27, 2001).

**34.** *Direct Mail Prod. Servs. Ltd. v. MBNA Corp.,* No. 99 Civ. 10550(SHS), 2000 WL 1277597, at *6 (S.D.N.Y. Sept. 7, 2000) (internal quotation marks and citations omitted); *see also, e.g., Hugel v. Corp. of Lloyd's,* 999 F.2d 206, 209 (7th Cir.1993) ("Regardless of the duty sought to be enforced in a particular cause of action, if the duty arises from the contract, the forum selection clause governs the action."); *Crescent Int'l, Inc. v. Avatar Comm.,* 857 F.2d 943, 944 (3d Cir.1988) (per curiam) ("We think, however, they demonstrate a principle that pleading alternate non-contractual theories is not alone enough to avoid a forum selection clause if the claims asserted arise out of the contractual relation and implicate the contract's terms."); *U.S. Fid. & Guar. Co.,* 2001 WL 300735, at *18 (quoting *Direct Mail*); *Karlberg European Tanspa, Inc. v. JK–Josef Kratz Vertriebsgeselischaft MbH,* 699 F.Supp. 669, 670 ("With regard to the interpretation of the forum clause, in a majority of past cases, when faced with a complaint containing breach of contract claims and assorted *ancillary* claims, courts typically conclude that these non-contract actions are intertwined with the contract claims or merely artfully drafted antitrust or tort claims grounded in the contract." (emphasis added)).

no one seriously could contend that he is engaged in artful pleading to avoid the forum selection clause. The plaintiff's present claims do not have their source in any duty or relationship established by the contract, they do not involve interpretation of the agreement, and they would not share common operative facts with a breach of contract action, were plaintiff conceivably to bring one. The only relationship the settlement agreement has with this lawsuit is to mark the date after which Ellingson's tortious conduct commenced and to provide a possible motive for his allegedly outrageous conduct, neither of which is a material [35] aspect of this case.[36]

Quite simply, the manifest purpose of the choice of forum clause was to ensure that litigation concerning the deal to settle the previous dispute be litigated in Los Angeles. Despite its breadth, there is nothing in its language to suggest that a claim for post-agreement tortious behavior unrelated to the breach or discharge of obligations under, or the meaning of, the agreement might be brought only in California.

For all of the foregoing reasons, MGI's motion to dismiss or transfer is denied in all respects.

SO ORDERED.

---

**35.** Notably, although plaintiff does allege that Ellingson engaged in harassment "presumably in retaliation" for plaintiff having negotiated the settlement agreement, *see* Am. Cpt. ¶ 10, he brings no employment discrimination or other claims in which the retaliatory acts of his employer would be a central issue.

**36.** The Court is aware that, in the context of interpreting insurance policy exclusions, the Second Circuit has given an expansive reading to the phrase "related to." *Coregis Ins. Co. v. Am. Health Found., Inc.,* 241 F.3d 123, 128–31 (2d Cir.2001). But *Coregis* does not alter the present analysis for two reasons. First, the forum selection cases cited above more specifically address the issue of when a tort claim is related to a contract, whereas *Coregis* addressed when a fraud claim is related to the insolvency of a company. *See id.* at

129 ("The Lawsuits are unquestionably 'connected to,' 'associated with,' and brought 'with reference to' the insolvency or financial impairment of the Companies, and thus plaintiffs' request for coverage for the Lawsuits is 'related to' such financial failure."); *id.* at 130 ("Moreover, the alleged misrepresentations were themselves related to the Companies' insolvency or financial impairment, despite being made prior to that event, because they were alleged to be statements about the Companies' financial condition that were intended to hide the fact that financial failure was looming on the horizon."). Second, as the above parentheticals demonstrate, the nexus between the fraud claims and the companies' insolvency in *Coregis* was much stronger than that between the parties' settlement agreement and plaintiff's tort claims here.