425 F.3d 158
 GRAND RIVER ENTERPRISES SIX NATIONS, LTD., Nationwide Tobacco, Inc., and 3B Holdings, Inc., Plaintiffs-Appellants,
Jash International, Inc., International Tobacco Partners, Ltd., and Sun Tobacco, Inc., Plaintiffs,
v.
William PRYOR, Bruce M. Botelho, Janet Napolitano, Bill Lockyer, Ken Salazar, M. Jane Brady, Thurbert E. Baker, Allan G. Lance, Jim Ryan, Steve Carter, Thomas J. Miller, Carla J. Stovall, Albert Benjamin Chandler, III, Richard P. Ieyoub, G. Steven Rowe, J. Joseph Curran, Jr., Thomas F. Reilly, Jennifer Granholm, Jeremiah W. Nixon, Michael McGrath, Don Stenberg, Eliot Spitzer, Roy Cooper, Betty D. Montgomery, Hardy Myers, Charles Condon, Mark Barnett, Paul G. Summers, Christine O. Gregoire, James E. Doyle, and Hoke Macmillan, each in their official capacity as Attorneys General of the States of Alabama, Alaska, Arizona, California, Colorado, Delaware, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Missouri, Montana, Nebraska, New York, North Carolina, Ohio, Oregon, South Carolina, South Dakota, Tennessee, Washington, Wisconsin, and Wyoming, respectively, Defendants-Appellees.
 Docket No. 03-9179.
 United States Court of Appeals, Second Circuit.
 Argued: May 11, 2005.
 Decided: September 28, 2005.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Leonard Violi, Mamaroneck, NY, for Plaintiffs-Appellants.
 Avi Schick, Deputy Counsel to the Attorney General of New York (Eliot Spitzer, Attorney General of the State of New York, David Nocenti, Counsel to the Attorney General, Lewis Polishook, Assistant Attorney General, on the brief) New York, NY, for Defendants-Appellees.
 Before: WALKER, Chief Judge, SACK and RAGGI, Circuit Judges.
 JOHN M. WALKER, JR., Chief Judge.
 
 
 1
 This appeal involves challenges to certain state statutes enacted pursuant to the $206 billion dollar Master Settlement Agreement ("MSA") settling litigation between forty-six states, as well as the District of Columbia and five U.S. territories,[1] and the four major tobacco companies. The three plaintiffs-appellants are Grand River Enterprises Six Nations, Ltd. ("Grand River"), a Canadian cigarette manufacturer; Nationwide Tobacco, Inc., a Washington State company that distributes cigarettes manufactured in the Philippines; and 3B Holdings, Inc., a Washington State manufacturer of loose tobacco. Defendants-appellees are thirty-one current and former state attorneys general sued in their official capacities.
 
 
 2
 Appellants appeal from the November 8, 2004, amended judgment of the United States District Court for the Southern District of New York (John F. Keenan, Judge) dismissing all of the non-New York defendants for lack of personal jurisdiction and all of the causes of action, except an antitrust claim, attacking these statutes. Appellants argue that these dismissals were erroneous. Appellees contend that the district court improperly granted certification under Federal Rule of Civil Procedure 54(b), which was necessary to permit this appeal to be heard, and, in any event, that the district court properly granted the motions to dismiss. For the following reasons, we conclude that the district court was correct in granting Rule 54(b) certification and in dismissing all but one of the substantive challenges (a commerce clause claim), and erred in finding no personal jurisdiction over the non-New York defendants.
 
 
 BACKGROUND
 
 
 3
 Between 1994 and 1998, many states sued the country's major tobacco companies (Philip Morris, R.J. Reynolds, Brown & Williamson, and Lorillard, collectively the "majors") in an attempt to recover the costs that the states had incurred in treating smoking-related illnesses. During the five months leading up to November 1998, the representatives of forty-six states (including New York) held numerous meetings with the majors in New York to negotiate and draft a nationwide settlement. The result was a Master Settlement Agreement, entered into on November 23, 1998, that resolved the pending lawsuits and released the majors from any future suits that the states might bring arising out of cigarette sales. Liggett, another tobacco company, previously settled with twenty-two of the states and was not party to the MSA. Four states (Florida, Minnesota, Mississippi, and Texas) had already settled independently with the majors.
 
 
 4
 Under the MSA, the majors agreed to pay the states $206 billion over the first twenty-five years of the agreement and, in addition, to accept advertising and marketing restrictions aimed primarily at reducing youth smoking. The majors, which manufactured approximately 97.5% of all cigarettes sold in the country when the MSA was signed, are referred to in the MSA as Original Participating Manufacturers ("OPMs").
 
 
 5
 The MSA included a provision authorizing other cigarette manufacturers to join the MSA as Subsequent Participating Manufacturers ("SPMs") and thereby resolve any claims that the states could otherwise assert against them. SPMs that signed onto the MSA within ninety days of its execution are not required to make any payments to the states unless their respective nationwide market shares exceed the greater of their 1998 market share or 125% of their 1997 market share — the so-called grandfather share. SPMs that did not join within ninety days received no grandfather share. SPMs, to the extent they exceed their grandfather share, if applicable, pay approximately two cents per cigarette as part of their settlement, which is identical to the per-cigarette OPM payment. Since November 1998, more than forty companies have joined the MSA as SPMs.
 
 
 6
 During negotiations, the majors expressed their concern that they would face increased competition (and a resulting loss of market share) from smaller manufacturers that did not join the MSA, so-called Non-Participating Manufacturers ("NPMs"), because the majors would have to raise prices to fund the MSA settlement and would be subject to advertising restrictions. For their part, the states were worried that NPMs could cause the states to continue to incur significant tobacco-related health costs while avoiding liability. To address these concerns, the MSA includes an "NPM Adjustment," which provides for a potential reduction in annual payments by Participating Manufacturers (i.e., both OPMs and SPMs, collectively "PMs") to the states if, inter alia, there is an aggregate market share loss by PMs to NPMs since 1997.
 
 
 7
 In addition, the MSA provides that the NPM adjustment does not apply to states that enact "Escrow Statutes," also known as "Qualifying Statutes" (the "Statutes"). These Statutes require each NPM to either (1) join the MSA as an SPM or (2) establish and fund an escrow or reserve account in an amount determined by the manufacturer's sales volume in the state. The per-cigarette amount is roughly equal to what an OPM or SPM would pay under the MSA. If the total amount that an NPM places into escrow in a given year exceeds what it would have paid under the MSA were it an SPM, the excess is refunded to the NPM. Unlike PMs who pay outright into the settlement fund, NPMs retain title to the escrowed funds and the interest on those funds. The funds are security for potential future damage awards resulting from cigarette-related claims. After 25 years, the escrow account will be restored to the NPM, minus any payments in respect of judgment against, or settlement by, the NPM because of its cigarette sales in a given state.
 
 
 8
 It is undisputed that the Escrow Statutes are an integral part of the nationwide settlement effected by the MSA. In order to facilitate passage of these Escrow Statutes, the majors and the states specifically negotiated in New York model escrow legislation that was ultimately included in the MSA's appendix. Each of the defendants' states independently enacted Escrow Statutes that are substantially identical to that suggested in the MSA. See, e.g., N.Y. Pub. Health Law § 1399-nn et seq. After enactment of the Escrow Statutes, New York and the other states passed "Contraband Statutes," or "Certification Statutes," to help ensure compliance with the Escrow Statutes. See, e.g., N.Y. Tax Law §§ 480-b, 481(1)(c), 1846(a-1). These laws require cigarette manufacturers, other than OPMs, that sell products in a state to certify annually to the state attorney general that they are either (1) meeting their obligation as an SPM under the MSA or (2) making escrow deposits as an NPM. Each statute penalizes noncompliance by denying a tax stamp, and thereby prohibiting the sale of cigarettes in that state by the non-complying manufacturer.
 
 
 9
 In their complaint, the NPM appellants alleged that the defendants have commenced or threatened enforcement actions against them for failure to establish escrow funds or for failure to adequately fund their escrow accounts. Appellants contend that they should be held not to be subject to these NPM requirements because the Escrow and Certification Statutes are unconstitutional under a variety of theories, violate Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and are preempted by the Federal Cigarette Labeling and Advertising Act ("FCLAA"), 15 U.S.C. § 1334(b). All of the non-New York defendants subsequently moved to dismiss for lack of personal jurisdiction, and all of the defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6).
 
 
 10
 By opinion and order, the district court dismissed the plaintiffs' complaint in its entirety. Grand River Enters. Six Nations, Ltd. v. Pryor ("Grand River I"), 2003 WL 22232974, at *17 (S.D.N.Y. Sept.29, 2003). The district court found that it lacked personal jurisdiction over the non-New York defendants, and it granted the defendants' motion to dismiss on the pleadings, finding that the complaint failed to state a claim. Id. at *7, *17. Appellants appealed.
 
 
 11
 Subsequently, this court decided a related case, Freedom Holdings, Inc. v. Spitzer ("Freedom Holdings I"), 357 F.3d 205, 226-33 (2d Cir.2004), that held, inter alia, that New York's Contraband Statutes were subject to the federal antitrust laws and rejected the argument that New York was immune from attack under the state-action immunity doctrine of Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). As a result, the district court in this case reconsidered its previous decision and reinstated the Sherman Act claim against New York State Attorney General Eliot Spitzer, the only remaining defendant. Grand River Enters. Six Nations, Ltd. v. Pryor ("Grand River II"), 2004 WL 1594869, at *2-*3 (S.D.N.Y. July 15, 2004). Appellants moved for an amended or final judgment, directing the entry of final judgment as to the dismissed defendants. Grand River Enters. Six Nations, Ltd. v. Pryor ("Grand River III"), 2004 WL 2480433, at *3 (S.D.N.Y. Nov.3, 2004). The district court granted the motion with respect to the Rule 12(b)(2) dismissal of claims against the non-New York defendants and the Rule 12(b)(6) dismissal of claims against all defendants on all claims except the antitrust claim. Id. This appeal followed.
 
 
 DISCUSSION
 
 I. Rule 54(b) Certification
 
 12
 We first address the defendants' contention that the district court abused its discretion in granting certification under Federal Rule of Civil Procedure 54(b). See Shrader v. Granninger, 870 F.2d 874, 878 (2d Cir.1989). Rule 54(b) permits certification of a final judgment where (1) there are multiple claims or parties, (2) at least one of the claims or the rights and liabilities of at least one party has been finally determined, and (3) "there is no just reason for delay." Fed.R.Civ.P. 54(b); see also Info. Res., Inc. v. Dun & Bradstreet Corp., 294 F.3d 447, 451 (2d Cir.2002).
 
 
 13
 Respect for the historic federal policy against piecemeal appeals requires that a Rule 54(b) certification not be granted routinely. The power should be used only in the infrequent harsh case where there exists some danger of hardship or injustice through delay which would be alleviated by immediate appeal.
 
 
 14
 Citizens Accord, Inc. v. Town of Rochester, 235 F.3d 126, 128-29 (2d Cir.2000) (per curiam) (internal citations and quotation marks omitted).
 
 
 15
 In granting appellants' Rule 54(b) motion, the district court reasoned that certification might avoid a duplicative trial should the decision denying personal-jurisdiction or dismissing the non-antitrust claims be reversed. Grand River III, 2004 WL 2480433, at *2 (citing Advanced Magnetics, Inc. v. Bayfront Partners, Inc., 106 F.3d 11, 16 (2d Cir.1997)). As they did below, the defendants contend that the district court gave insufficient weight to the availability to appellants of relief in state courts. Specifically, they assert that "Plaintiffs have always been able to challenge the validity of the statutes at issue in this case by interposing their claims as defenses to actions brought by the Defendants in state courts to enforce those statutes."
 
 
 16
 The district court did not abuse its discretion in certifying the appeal. The states offer no support for the awkward argument that certification is inappropriate because appellants could gain relief by raising their claims as defenses in thirty-some hypothetical state lawsuits. As the district judge recognized, it would make no sense to try the antitrust count against New York State alone if the dismissals of the other states or the other claims turned out to be in error. This is precisely the type of "danger of hardship or injustice," Citizens Accord, 235 F.3d at 129, to which Rule 54(b) is directed.
 
 
 17
 II. Personal Jurisdiction over the Non-New York Defendants
 
 
 18
 We next turn to whether the district court erred in dismissing the non-New York defendants for lack of personal jurisdiction. The district court concluded that it lacked general jurisdiction under N.Y. C.P.L.R. § 301, as well as specific jurisdiction under either N.Y. C.P.L.R. § 302(a)(1) (transaction of business within New York) or N.Y. C.P.L.R. § 302(a)(2) (tortious act within New York).
 
 A. Legal Standards
 
 19
 "District courts resolving issues of personal jurisdiction must ... engage in a two-part analysis." Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir.1999). First, a district court must determine whether, under the laws of the forum state (New York in this case), there is jurisdiction over the defendant. Id. "Second, [it] must determine whether an exercise of jurisdiction under these laws is consistent with federal due process requirements." Id. We review a dismissal for want of personal jurisdiction de novo. Id. In opposing a motion to dismiss for lack of personal jurisdiction, "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." Id. "Where a court [has chosen] not to conduct a full-blown evidentiary hearing on the motion, the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials." Id. (internal quotation marks omitted) (alteration in original).
 
 
 20
 B. N.Y. C.P.L.R. § 302(a)(1) — Transaction of Business Within New York
 
 
 21
 New York C.P.L.R. § 302(a)(1) provides, in relevant part, for specific jurisdiction over a non-resident defendant that "transacts any business within the state...." Id.
 
 
 22
 A nondomiciliary "transacts business" under [C.P.L.R. §] 302(a)(1) when he purposefully avails [himself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws.
 
 
 23
 No single event or contact connecting defendant to the forum state need be demonstrated; rather, the totality of all defendant's contacts with the forum state must indicate that the exercise of jurisdiction would be proper.
 
 
 24
 CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir.1986) (internal quotation marks and citations omitted) (second and third alterations in the original) (emphasis added). Section 302 "is a single-act statute requiring but one transaction — albeit a purposeful transaction — to confer jurisdiction in New York." Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13, 17, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970) (internal quotation marks omitted). Moreover, where there is a showing that business was transacted, there must be a "substantial nexus" between the business and the cause of action. Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 59-60 (2d Cir.1985).
 
 
 25
 Appellants' argument in support of their claim that the states transacted business in New York is premised principally on the five months that the non-New York attorneys general spent negotiating in New York over the MSA and the model Escrow Statute. Appellants also contend that the non-New York defendants' business in New York continued because Citibank, N.A., and PriceWaterhouseCoopers, both New York firms, were appointed escrow agent and independent auditor under the MSA, respectively, and because, in an escrow agreement with Citibank, each defendant agreed to submit to the jurisdiction of the New York State Courts to resolve any dispute arising under the agreement.
 
 
 26
 The district court considered the New York location of the negotiations to be "purely coincidental" and "fortuitous." Grand River I, 2003 WL 22232974, at *6. The district court also explained that, in coming to New York to settle these numerous lawsuits, "[i]t is unlikely that any of the defendants could have foreseen the possibility that negotiations related to the settlement of lawsuits against the Majors would lead to them being sued in New York by non-parties to the MSA challenging statutes passed by their home-state legislatures." Id.
 
 
 27
 The non-New York defendants continue to press these arguments on appeal, but we are not convinced. The parties to the MSA could have negotiated it in any state, so it was, to some degree, fortuitous that the settlement was negotiated in New York. But one can make the same argument for almost any contract. This is not a case, like Presidential Realty Corp. v. Michael Square West, Ltd., 44 N.Y.2d 672, 673, 405 N.Y.S.2d 37, 376 N.E.2d 198 (1978), in which the New York Court of Appeals found no personal jurisdiction where an agreement negotiated elsewhere and a modification letter were signed in New York.
 
 
 28
 After reviewing the record de novo, we believe that the extensive New York negotiations over the MSA and model escrow legislation language, and the agreement's ultimate execution in New York, satisfy § 302(a)(1)'s transacts-any-business requirement.[2] Under New York law, the transacts-business standard can be satisfied where both the negotiations and execution of a contract took place within New York. See, e.g., George Reiner & Co. v. Schwartz, 41 N.Y.2d 648, 652-53, 394 N.Y.S.2d 844, 363 N.E.2d 551 (1977). Here, the various state attorneys general purposefully dedicated five months to negotiating the MSA and the interconnected model escrow legislation with the majors in New York. Settling a civil suit seeking compensation for, inter alia, healthcare costs is a business transaction. See Ainbinder v. Potter, 282 F.Supp.2d 180, 186-87 (S.D.N.Y.2003) (finding negotiation and execution of settlement agreement satisfied transacting-business standard); see also David D. Spiegel, New York Practice § 86, at 152 (4th ed.2005) (stating § 301(a)(1) "may ... be used for a contract of a non-commercial nature," such as a separation agreement). And we see no reason why the negotiation and execution of the Master Settlement Agreement should be viewed any differently than an ordinary commercial contract.
 
 
 29
 The next question is whether a "substantial nexus" exists between the New York negotiations and appellants' causes of action. Because the Escrow Statutes were formally and independently enacted by the individual sovereign states that enforce them, the states assert that the nexus is insufficient to support personal jurisdiction. Despite the argument's superficial appeal, we are not persuaded.
 
 
 30
 The surviving antitrust cause of action challenges not only the passage and enforcement of the Escrow Statutes and the associated Contraband Statutes, but also the MSA. The complaint alleges that the Escrow Statutes require an NPM either to (1) enter into the MSA or (2) pay into an escrow fund. Compl. ¶ 143. It goes on to state that "[these] restraints and agreements ... constitute a contract, combination or conspiracy in restraint of trade." Id. (emphasis added). These "restraints and agreements" refer to the MSA, as well as the Escrow and Contraband Statutes. Thus, the appellants' attack on the Escrow Statutes is also plainly an attack on the MSA itself. See Freedom Holdings I, 357 F.3d at 223-24 (permitting attack on Contraband Statutes as "`hybrid' restraints on trade"); Freedom Holdings Inc. v. Spitzer ("Freedom Holdings II"), 363 F.3d 149, 154 (2d Cir.2004) ("[A]lthough the statutes themselves are acts of the state, their function is to enforce the MSA .... Thus, the MSA is part and parcel of the Challenged Statutes...."); see also Star Scientific, Inc. v. Beales, 278 F.3d 339, 359 (4th Cir.2002). There is thus a substantial nexus between the negotiation and signing of the MSA in New York, and the antitrust suit. And because these negotiations were carried on in New York, it was foreseeable that appellants would be subject to suit in the state. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297-98, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Accordingly, jurisdiction properly exists over the non-New York defendants.
 
 
 31
 We note that New York would not ordinarily be the proper forum to challenge another state's legislative and executive actions. It is a rare event for the representatives of various sovereign states to assemble purposefully in New York to attempt to jointly settle related lawsuits and to agree to then pass individual state statutes. But because that is what took place, New York is the proper forum for this lawsuit. Cf. Kronisch v. United States, 150 F.3d 112, 131 (2d Cir.1998) (finding federal official's visits to New York to "lay[] groundwork for [] LSD testing program" sufficient to sustain personal jurisdiction, where claim arose out of drug testing in France).
 
 III. Substantive Claims
 
 32
 We next turn to appellants' arguments that the district court erred in dismissing their various challenges to the Escrow Statutes and the MSA. We review the dismissals de novo, accepting as true the material facts alleged in the complaint and drawing all reasonable inferences in favor of the appellants. Freedom Holdings I, 357 F.3d at 216.
 
 A. Commerce Clause
 
 33
 Appellants first fault the district court for dismissing their claims that the Escrow Statutes contravened the dormant Commerce Clause and the Indian Commerce Clause. See Grand River I, 2003 WL 22232974, at *10-*12. We consider each in turn.
 
 1. Dormant Commerce Clause
 
 34
 The Commerce Clause provides that "Congress shall have Power... To regulate Commerce with foreign Nations and among the several States...." U.S. Const. art. I, § 8, cl. 3. While the Commerce Clause is more frequently invoked as authority for federal legislation, the so-called dormant Commerce Clause limits state legislation that adversely affects interstate commerce. See Hughes v. Oklahoma, 441 U.S. 322, 326, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979); Freedom Holdings I, 357 F.3d at 216.
 
 
 35
 A state statute may violate the dormant Commerce Clause in three ways:
 
 
 36
 First, a statute that clearly discriminates against interstate commerce in favor of intrastate commerce is virtually invalid per se and can survive only if the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism. Second, if the statute does not discriminate against interstate commerce, it will nevertheless be invalidated under the Pike [v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970),] balancing test if it imposes a burden on interstate commerce incommensurate with the local benefits secured. Third, a statute will be invalid per se if it has the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question.
 
 
 37
 Freedom Holdings I, 357 F.3d at 216 (internal quotation marks and citations omitted).
 
 
 38
 In Freedom Holdings I, we rejected all three theories in a Commerce Clause challenge to New York's Contraband Statute. Id. at 217 ("Even assuming that appellants raised each of these theories in the district court and on appeal and that they are properly before us, none constitutes a valid claim under any version of the dormant Commerce Clause doctrine."). Here, we believe that the district court, while correctly rejecting two of the theories, erred in dismissing the extraterritorial-effect claim.
 
 
 39
 a. Discrimination Against Interstate Commerce
 
 
 40
 A state statute will be found to discriminate against interstate commerce only if it accords "differential treatment [to] in-state and out-of-state economic interests that benefits the former and burdens the latter. If a restriction on commerce is discriminatory, it is virtually per se invalid." Or. Waste Sys., Inc. v. Dep't of Envtl. Quality, 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994).
 
 
 41
 Appellants contend that the challenged statutes discriminate against interstate commerce in favor of the economic interests of each defendant's state. They allege that the Statutes have the "prohibited purpose and effect of favoring a finite set of businesses, i.e., the OPMs and early signing SPMs, to the detriment of interstate commerce and, specifically, the interstate commerce in products produced or sold by Plaintiffs," who are NPMs.
 
 
 42
 This argument is unavailing. As in Freedom Holdings I, "[a]ppellants cannot and do not identify any in-state commercial interest that is favored, directly or indirectly, by the [challenged s]tatutes at the expense of out-of-state competitors." 357 F.3d at 218. And the district court properly found that all NPMs are treated the same: both in-state and out-of-state NPMs are subject to the same requirements. Grand River I, 2003 WL 22232974, at *11. The Commerce Clause prohibits, for example, New York from favoring New York tobacco manufacturers over out-of-state manufacturers, see Granholm v. Heald, ___ U.S. ___, ___, 125 S.Ct. 1885, 1895, 161 L.Ed.2d 796 (2005); it is not violated simply by treating PMs and NPMs differently.
 
 
 43
 b. Local Benefits Outweigh Burdens on Interstate Commerce (Pike Balancing Test)
 
 
 44
 Appellants also contend that the district court erred, under the Pike balancing test, by finding that any burden the challenged statutes place on interstate commerce is outweighed by the benefits of local public health and reduced cigarette consumption. See Grand River I, 2003 WL 22232974, at *10-*11.
 
 
 45
 In Pike v. Bruce Church, Inc., the Supreme Court established the balancing test applicable to nondiscriminatory state legislation affecting interstate commerce:
 
 
 46
 Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.
 
 
 47
 397 U.S. at 142, 90 S.Ct. 844 (internal citation omitted). To apply this balancing test, we consider (1) the nature of the local benefits advanced by the statute; (2) the burden placed on interstate commerce by the statute; and (3) whether the burden is "clearly excessive" when weighed against these local benefits. Id.
 
 
 48
 We agree with the district court that the challenged statutes were plainly enacted with significant public interests in mind: public health and the allocation of related costs. Grand River I, 2003 WL 22232974, at *11. The funds in the escrow account ensure a source of funds against which the states may settle judgments to recover smoking-related healthcare costs. As the Fourth Circuit observed in discussing a Virginia statute that is substantially the same as those challenged here:
 
 
 49
 Virginia's qualifying statute serves the legitimate state interest of ensuring that Virginia has a source of recovery for future smoking-related healthcare costs attributable to tobacco manufacturers who have not subscribed to the Master Settlement Agreement and who, therefore, are not already compensating the Commonwealth for these healthcare costs. Thus, the putative local benefits are both legitimate and important.
 
 
 50
 Star Scientific, 278 F.3d at 357. Moreover, appellants have failed to even allege that there is a "qualitatively or quantitatively different" burden on interstate commerce than on intrastate commerce, Nat'l Elec. Mfrs. Ass'n v. Sorrell, 272 F.3d 104, 109 (2d Cir.2001); see also Freedom Holdings I, 357 F.3d at 219 (holding, under the Pike balancing test, that Contraband Statutes "do not impose `unequal burdens' on interstate and intrastate commerce"), or that the Escrow Statutes have a "disparate impact on interstate commerce," Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc., 155 F.3d 59, 75 (2d Cir.1998).
 
 
 51
 c. Extraterritorial Effect
 
 
 52
 Appellants finally assert that the Escrow Statutes "limit, burden[,] and regulate directly" interstate commerce wholly outside of the respective states. Compl. ¶ 132. As they did below, appellants rely on the Supreme Court's price-parity decisions in Brown-Forman Distillers Corp. v. New York State Liquor Authority, 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986), and Healy v. Beer Institute, Inc., 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989). In both Brown-Forman and Healy, the Supreme Court struck down state liquor regulations because they effectively set liquor prices in neighboring states. In Brown-Forman, a New York law required liquor distillers to affirm that their New York prices were no higher than the lowest price at which the same product would be sold in any other state during the month. 476 U.S. at 575-76, 106 S.Ct. 2080. In Healy, a Connecticut law required out-of-state beer shippers to affirm that the prices at which their products were sold to Connecticut wholesalers were no higher than the prices at which those same products were sold in neighboring states. 491 U.S. at 326-27, 109 S.Ct. 2491. The Supreme Court explained the extraterritoriality analysis as follows:
 
 
 53
 First, the Commerce Clause ... precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State; and, specifically, a State may not adopt legislation that has the practical effect of establishing a scale of prices for use in other states. Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature. The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State. Third, the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation. Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State. And, specifically, the Commerce Clause dictates that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another.
 
 
 54
 Id. at 336-37, 109 S.Ct. 2491 (internal quotation marks and citations omitted) (emphasis added).
 
 
 55
 As noted above, the challenged statutes require an NPM selling cigarettes in a state to either pay into the state escrow fund or join the MSA as an SPM. See, e.g., N.Y. Pub. Health Law § 1399-pp. Appellants contend that the Statutes together "establish an interdependent and interconnecting system of regulation, the practical effect of which is to set uniform (higher) prices nationwide."
 
 
 56
 We do not agree with the defendants that Grand River's Commerce Clause claim can be so easily compared with that of Freedom Holdings I, where we rejected an extraterritorial-effect claim challenging New York's Contraband Statute. In that case, the appellants "claim[ed] that the `artificially high prices' [in New York] fostered by the Contraband Statutes `inflate[]' the prices charged by cigarette manufacturers to purchasers in sales transactions that occur wholly outside the State of New York." 357 F.3d at 220. We held that "[t]he extraterritorial effect described by appellants amounts to no more than the upstream pricing impact of a state regulation." Id. But Freedom Holdings I left open other avenues of attack:
 
 
 57
 [A]ppellants have not alleged that the Contraband Statutes are inconsistent with the legitimate regulatory regimes of other states, that the Contraband Statutes force out-of-state merchants to seek New York regulatory approval before undertaking an out-of-state transaction, or that any sort of interstate regulatory gridlock would occur if "many or every" state adopted similar legislation.
 
 
 58
 Id. at 221. Appellants here have alleged the latter in their complaint.
 
 
 59
 In Healy, the Supreme Court recognized a potential problem where multiple states decide to enact "essentially identical" statutes in the pricing-parity context. Healy, 491 U.S. at 339, 109 S.Ct. 2491. The Court worried about potential regulatory "price gridlock" or the "short-circuiting of normal pricing decisions" that could result:
 
 
 60
 The short-circuiting of normal pricing decisions based on local conditions would be carried to a national scale if a significant group of States enacted contemporaneous affirmation statutes that linked in-state prices to the lowest price in any State in the country. This kind of potential regional and even national regulation of the pricing mechanism for goods is reserved by the Commerce Clause to the Federal Government and may not be accomplished piecemeal through the extraterritorial reach of individual state statutes.
 
 
 61
 Id. at 340, 109 S.Ct. 2491.
 
 
 62
 Here, appellants contend that the aggregate effect of the states' Escrow and Contraband Statutes is to create a uniform system of regulation that results in higher prices nationwide. As noted, these Statutes require a manufacturer to either join the MSA or pay into a state escrow fund. If a manufacturer joins the MSA as an SPM, the amount it pays as part of the settlement is tied directly to the manufacturer's national market share, as well as the OPMs' national market shares and the NPM adjustment.[3] See Master Settlement Agreement ¶ IX(i). Alternatively, a non-joining manufacturer, as an NPM, must make escrow payments in each MSA state in which it sells cigarettes. Although the states take the position that the escrow-fund option depends upon only in-state sales, they fail to acknowledge that the amount a manufacturer pays into the escrow fund is, in part, keyed to the amount an NPM would have paid if it had joined the MSA as an SPM — a national-market-share-dependent amount — because the manufacturer is refunded any excess over what it would have paid under the MSA. See id., Ex. T (model statute); see also, e.g., N.Y. Pub. Health Law § 1399-pp.[4]
 
 
 63
 Accordingly, appellants have successfully stated a possible claim that the practical effect of the challenged statutes and the MSA is to control prices outside of the enacting states by tying both the SPM settlement and NPM escrow payments to national market share, which in turn affects interstate pricing decisions. We cannot say at this early stage of the litigation on a motion to dismiss that the Statutes' practical effect is solely intrastate, for the appellants have essentially alleged that the aggregate effect of the thirty-one states' Escrow Statutes and the MSA is to "short-circuit[] normal pricing decisions" by effectively "regulat[ing] the pricing mechanism for goods" in interstate commerce. Healy, 491 U.S. at 340, 109 S.Ct. 2491. While we take no position as to the ultimate viability of the dormant commerce clause claim, we believe that not dismissing this claim at the pleading stage is consistent with the district court's decision to reinstate the Sherman Act claim, which alleged that the MSA and interrelated statutes restrained trade and affected market prices.[5] See Grand River II, 2004 WL 1594869, at *2-*3.
 
 2. Indian Commerce Clause
 
 64
 Grand River alone further argues that the Escrow Statutes regulate it in violation of the Constitution's Indian Commerce Clause; the district court rejected this argument. See Grand River I, 2003 WL 22232974, at *12. Grand River is controlled by Native Americans and alleges that it sells cigarettes only on Indian land. The company contends that the Statutes contravene the Indian Commerce Clause by holding it responsible for escrow payments because its cigarettes are subsequently resold by third parties off-reservation. This argument is unavailing.
 
 
 65
 The Indian Commerce Clause provides that "Congress shall have Power ... To regulate Commerce ... with the Indian Tribes." U.S. const. art. I, § 8, cl. 3. "[T]he central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs." Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 192, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989). And the Indian Commerce Clause's grant of authority to the federal government, and preemption of state authority, extends only to activities occurring in "Indian country," i.e., Indian lands within the territory of the United States. See 18 U.S.C. § 1151; Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148-49, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973); cf. Okla. Tax Comm'n v. Chickasaw Nation, 515 U.S. 450, 458-59, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995).
 
 
 66
 Section 1151 of Title 18 of the United States Code makes clear that "Indian country" is limited to territory within the United States, defining it as:
 
 
 67
 (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.
 
 
 68
 Id.; see also DeCoteau v. Dist. County Court for Tenth Judicial Dist., 420 U.S. 425, 427 n. 2, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975) (collecting cases and stating that "[w]hile § 1151 is concerned, on its face, only with criminal jurisdiction, the [Supreme] Court has recognized that it generally applies as well to questions of civil jurisdiction"); Oneida Indian Nation v. City of Sherrill, 337 F.3d 139, 153 n. 11 (2d Cir.2003), rev'd on other grounds, ___ U.S. ___, 125 S.Ct. 1478, 161 L.Ed.2d 386 (2005). And Native Americans transacting business outside of Indian country can be subject to state regulation. In Mescalero, the Supreme Court held that New Mexico could impose a tax on the gross receipts of a ski resort, operated by the Mescalero Apache Tribe, that was located outside of the boundaries of the tribe's reservation. Mescalero, 411 U.S. at 146-50, 93 S.Ct. 1267. The Court stated that "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State." Id. at 149-50, 93 S.Ct. 1267.
 
 
 69
 Here, Grand River states in its complaint that it is a "Canadian limited liability company that is owned by Native North Americans[, the Six Nations or Iroquois Confederacy]," and that it "operates and is located on tribal land in Ontario, Canada." Compl. ¶ 26. Although the Iroquois Confederacy reservation includes land in both the United States and Canada, Grand River itself operates only on land that is outside of the United States. Thus, the activities of Grand River in Canada are no different than the off-reservation activities in Mescalero. The fact that the Canadian part of the reservation may be given some special recognition by the Canadian government has no bearing on the question of whether Grand River is conducting business in "Indian country," as defined in § 1151. Thus, the imposition of an escrow requirement for cigarette manufacturing in Canada does not run afoul of the Indian Commerce Clause, and the district court correctly dismissed this cause of action.
 
 B. Procedural Due Process
 
 70
 Appellants next argue that the escrow funds operate as unconstitutional prejudgment deprivations of property without due process of law and that they are entitled to a hearing before the funds are placed in escrow. They compare the escrow accounts to the kind of unconstitutional prejudgment remedy found in Krimstock v. Kelly, 306 F.3d 40, 53 (2d Cir.2002), where, without a hearing, the police took possession of a car allegedly used in a crime pending the outcome of a civil-forfeiture proceeding, or in Connecticut v. Doehr, 501 U.S. 1, 14, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991), where, also without a hearing, Connecticut permitted the prejudgment attachment of real estate.
 
 
 71
 The district court properly rejected this argument. Appellants challenge the states' legislative, not adjudicative, actions, and "[o]fficial action that is legislative in nature is not subject to the notice and hearing requirements of the due process clause." Interport Pilots Agency, Inc. v. Sammis, 14 F.3d 133, 142 (2d Cir.1994). Here, the escrow reserves are not specific to any particular litigation; rather, they are legislative preconditions for the privilege of engaging in future cigarette sales in the individual states. See United States v. Fla. E. Coast Ry. Co., 410 U.S. 224, 245, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973). The reserves are designed to ensure that funds are available should litigation subsequently begin and result in judgment against the manufacturers. Thus, the accounts are substantially different in kind from any individual prejudgment deprivation of property.
 
 C. Remaining Claims
 
 72
 Appellants also contend that the Escrow Statutes violate their equal-protection and substantive due-process rights. These arguments are unavailing because the Escrow Statutes are rationally related to a legitimate state interest: promoting public health and recovering the costs of tobacco-related illnesses. See, e.g., N.Y. Pub. Health Law § 1399-nn (declaring that it is in the interest of New York to establish an escrow fund because of public health concerns); see also Star Scientific, 278 F.3d at 350 (concluding that legislation is rationally related to legitimate state interest).
 
 
 73
 We have carefully considered appellants' other arguments and find them to be without merit.
 
 
 CONCLUSION
 
 
 74
 For the foregoing reasons, the judgment of the district court is hereby AFFIRMED in part and REVERSED in part, and the case is REMANDED to the district court for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 The five territories are American Samoa, Guam, the Northern Marianas, Puerto Rico, and the U.S. Virgin Islands
 
 
 [2]
 Because specific jurisdiction under § 302(a)(1) is appropriate, we do not reach the questions of whether specific jurisdiction under § 302(a)(2) could also be found for a tort committed within New York, or whether general jurisdiction under § 301 could be found over the non-New York defendants whose states maintain revenue offices in New York
 
 
 [3]
 The MSA requires the following payments by SPMs:
 (1) A Subsequent Participating Manufacturer shall have payment obligations under this Agreement only in the event that its Market Share in any calendar year exceeds the greater of (1) its 1998 Market Share or (2) 125 percent of its 1997 Market Share (subject to the provisions of subsection (i)(4)). In the year following any such calendar year, such Subsequent Participating Manufacturer shall make payments corresponding to those due in that same following year from the Original Participating Manufacturers pursuant to subsections VI(c) (except for the payment due on March 31, 1999), IX(c)(1), IX(c)(2) and IX(e). The amounts of such corresponding payments by a Subsequent Participating Manufacturer are in addition to the corresponding payments that are due from the Original Participating Manufacturers and shall be determined as described in subsections (2) and (3) below. Such payments by a Subsequent Participating Manufacturer shall (A) be due on the same dates as the corresponding payments are due from Original Participating Manufacturers; (B) be for the same purpose as such corresponding payments; and (C) be paid, allocated and distributed in the same manner as such corresponding payments.
 (2) The base amount due from a Subsequent Participating Manufacturer on any given date shall be determined by multiplying (A) the corresponding base amount due on the same date from all of the Original Participating Manufacturers (as such base amount is specified in the corresponding subsection of this Agreement and is adjusted by the Volume Adjustment (except for the provisions of subsection (B)(ii) of Exhibit E), but before such base amount is modified by any other adjustments, reductions or offsets) by (B) the quotient produced by dividing (i) the result of (x) such Subsequent Participating Manufacturer's applicable Market Share (the applicable Market Share being that for the calendar year immediately preceding the year in which the payment in question is due) minus (y) the greater of (1) its 1998 Market Share or (2) 125 percent of its 1997 Market Share, by (ii) the aggregate Market Shares of the Original Participating Manufacturers (the applicable Market Shares being those for the calendar year immediately preceding the year in which the payment in question is due).
 (3) Any payment due from a Subsequent Participating Manufacturer under subsections (1) and (2) above shall be subject (up to the full amount of such payment) to the Inflation Adjustment, the Non-Settling States Reduction, the NPM Adjustment, the offset for miscalculated or disputed payments described in subsection XI(i), the Federal Tobacco Legislation Offset, the Litigating Releasing Parties Offset and the offsets for claims over [sic] described in subsections XII(a)(4)(B) and XII(a)(8), to the extent that such adjustments, reductions or offsets would apply to the corresponding payment due from the Original Participating Manufacturers. Provided, however, that all adjustments and offsets to which a Subsequent Participating Manufacturer is entitled may only be applied against payments by such Subsequent Participating Manufacturer, if any, that are due within 12 months after the date on which the Subsequent Participating Manufacturer becomes entitled to such adjustment or makes the payment that entitles it to such offset, and shall not be carried forward beyond that time even if not fully used.
 (4) For purposes of this subsection (i), the 1997 (or 1998, as applicable) Market Share (and 125 percent thereof) of those Subsequent Participating Manufacturers that either (A) became a signatory to this Agreement more than 60 days after the MSA Execution Date or (B) had no Market Share in 1997 (or 1998, as applicable), shall equal zero.
 Master Settlement Agreement ¶ IX(i).
 
 
 [4]
 New York's Escrow Statute, like those of the other states, links escrow payments to the MSA:
 to the extent that a tobacco product manufacturer establishes that the amount it was required to place into escrow on account of units sold in the state in a particular year was greater than the master settlement agreement payments, as determined pursuant to section IX(i) of the master settlement agreement including after final determination of all adjustments, that such manufacturer would have been required to make on account of such units sold had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer....
 N.Y. Pub. Health Law § 1399-pp(2)(b)(ii).
 
 
 [5]
 For substantially the same reasons that specific jurisdiction is proper for the antitrust claim, we conclude that jurisdiction exists for this commerce clause claim as well